[No. H004669. Sixth Dist. Sept. 14, 1990.]

THE PEOPLE, Plaintiff and Appellant, v.
REESE COULTER GWILLIM, Defendant and Appellant.

**1258**

COUNSEL

Leo Himmelsbach, District Attorney, and Kate E. Bloch, Deputy District Attorney, for Plaintiff and Appellant.

Craig M. Brown for Defendant and Appellant.

OPINION

**AGLIANO, P. J.**—Defendant, a police officer, was charged with sexual battery (Pen. Code, § 243.4, subd. (a)), assault with intent to commit rape (Pen. Code, § 220), and false imprisonment (Pen. Code, § 236). During an internal investigation conducted by the police department, defendant made a confidential statement under a grant of use immunity. The statement was turned over to the district attorney, who revealed portions of it to the alleged victim. In successive pretrial motions, defendant contended the criminal action should be dismissed because (1) the district attorney had improperly received and used the immunized statement, and (2) the district attorney's and victim's knowledge of the statement had irreparably "tainted" the proceedings.

The trial court denied defendant's first motion, finding that the district attorney had a statutory right (Pen. Code, § 832.7) to receive defendant's immunized statement and that the victim's decision to testify and the district attorney's decision to prosecute derived from sources independent of the statement. The trial court granted defendant's second motion, however, finding that the criminal proceedings were irreparably "tainted." The People appeal. Defendant cross-appeals, arguing that the trial court erred in denying the first motion.

We reverse. We conclude that the trial court erred by dismissing the action based upon an undifferentiated "taint." The record at this stage indicates the People's case is derived from sources independent of defendant's immunized statement.

We dismiss defendant's cross-appeal for lack of jurisdiction. Nonetheless, in order to determine whether the dismissal was proper on other grounds, we examine the trial court's decision that the district attorney had a statutory right to receive defendant's statement and that the victim's decision to testify and the district attorney's decision to prosecute were based on factors independent of defendant's immunized statement. We conclude that these rulings were correct.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 17, 1987, Officer M. reported to her supervisor, Lt. Tim Skalland, two incidents of sexual misconduct by defendant, a police sergeant. The incidents allegedly occurred on April 8 and 14 while defendant and Officer M. were alone, on duty, in houses engaged by the San Jose Police Department for use in a burglary sting operation.

The police department initiated two investigations: a criminal investigation headed by Lt. Harry Stangel of the department's sexual assault investigation unit and an internal investigation headed by Lt. Walt Adkins of the department's internal affairs unit.

On April 18, Adkins interviewed Officer M. as part of the internal investigation. On April 19, Stangel spoke with her in connection with the criminal investigation. Both interviews were tape-recorded.

On April 20, Stangel sought to interview defendant as part of the criminal investigation. Defendant declined to waive his *Miranda*[1] rights, and no interview was conducted.

Later that day, Adkins sought to interview defendant as part of the internal investigation. When defendant, who was accompanied by counsel, declined to waive his *Miranda* rights, Adkins advised defendant pursuant to the department "Grant of Immunity Admonition," which had been drafted to comply with the requirements of *Lybarger* v. *City of Los Angeles* (1985) 40 Cal.3d 822 [221 Cal.Rptr. 529, 710 P.2d 329]. The admonition warned that if defendant refused to make a statement, he could be subject to discipline, including dismissal. But if defendant chose to answer, "your statements and any information gathered by reason of such statement will be held confidential consistent with Penal Code section 832.7, and will not be divulged except as required by law. Your statements may however be used against you subsequently in relations, in relation to departmental charges. In addition, any statements that you make under the compulsion or threats of such discipline cannot be used against you in any subsequent criminal proceedings."[2] Defendant then gave a recorded statement (hereafter immunized statement).

---

[1] See *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[2] The full admonition, as stated by Lt. Adkins, was as follows: "You are advised that I am authorized by the Chief of Police as an officer of the Internal Affairs Unit to question you as part of an official investigation by the San Jose Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties. You are entitled to all of the rights and privileges granted by the constitution and laws of the United States and the State of California, including the right not to be compelled to

Immediately thereafter, voluntarily and unaccompanied by counsel, defendant gave an account of the incidents to Burglary Prevention Unit Supervisor Skalland. Skalland, who was unconnected to either the criminal investigation or the internal investigation, described his conversation with defendant in a memorandum to Adkins.

On April 21, Adkins conducted a recorded, follow-up interview with Officer M. Adkins told Officer M. he had spoken with defendant about the incidents. Adkins's follow-up questions focused on information he had obtained from defendant's immunized statement the day before. He sought more detail from Officer M. about events of April 8 and 14 and about another incident two months earlier.

In their statements, both Officer M. and defendant described two incidents of kissing and fondling on April 8 and 14. Officer M. contended that the contacts occurred against her will and that she tried to extricate herself diplomatically. Defendant maintained that Officer M. appeared at first to encourage the encounters and that he ceased contact once he understood she objected.

Meanwhile, the Santa Clara County District Attorney's Office was alerted to the situation, and Deputy District Attorney Dale Sanderson was assigned to the case. He asked the police department's sexual assault investigation unit to forward relevant transcripts and information. Sanderson received two sets of materials, one the week of April 20 and one the week of April 27. Included in the materials was a tape recording of defendant's immunized statement to Adkins. Sanderson listened to the tape.

Sanderson spoke with Officer M. several times in late April and, according to his later testimony, found her "hesitant" to testify in criminal proceedings. At one or more of those meetings with Officer M., Sanderson revealed information about defendant's immunized statement. On Monday, May 4, Officer M. informed Sanderson that she was willing to testify against defendant in a criminal proceeding. Three days later, the district attorney's

---

incriminating [*sic*] yourself and the right to have legal counsel present at each and every stage of the investigation. I further wish to advise you that if you refuse to answer questions relating to the performance of your official duties you will be subject to departmental charges which could result in your dismissal from the San Jose Police Department. If you do not [*sic*] answer, your statements and any information gathered by reason of such statement will be held confidential consistent with Penal Code section 832.7, and will not be divulged except as required by law. Your statements may however be used against you subsequently in relations, in relation to departmental charges. In addition, any statements that you make under the compulsion or threats of such discipline cannot be used against you in any subsequent criminal proceedings."

office filed a criminal complaint charging defendant with one count of felony sexual battery (Pen. Code, § 243.4, subd. (a)).

Defendant was held to answer after a preliminary hearing several weeks later. At the hearing, Officer M. testified that she spoke to several people in an effort to make up her mind about testifying against defendant in criminal proceedings. She spoke to the president and another board member of the women's police officers association, to an attorney, to the San Jose Chief of Police, and to her roommate, who was also a police officer. None of them told her what to do. They helped her weigh the pros and cons, which included the ordeal of going through a criminal trial and the possible negative effect on her career as a police officer. She said that she was ultimately persuaded by a belief that if defendant were a private citizen, rather than a police officer, he would be prosecuted.

Following the preliminary hearing, the district attorney's office filed a two-count information, adding a charge of assault with intent to commit rape (Pen. Code, § 220). Defendant moved to dismiss the new count for lack of evidence and insufficient notice under Penal Code section 995. The district attorney next moved to amend the information to add a third count alleging felony false imprisonment (Pen. Code, § 236). Defendant opposed the motion and asserted a claim of prosecutorial vindictiveness. On September 30, 1987, the court granted the motion to amend the information and denied defendant's motions.

Deputy District Attorney Sanderson testified at the hearing. From that testimony, defendant learned that the district attorney's office had obtained defendant's immunized statement. Sanderson testified that he believed his recounting of portions of defendant's statement influenced Officer M. to testify against defendant in criminal proceedings. He said that Officer M. seemed "surprised" and "hurt" that defendant had told a different version to Adkins than she had. Sanderson testified that he did not intend to pressure Officer M., but he admitted that he knew she was wavering and that, without her testimony, a successful prosecution was unlikely. Although the district attorney's office decided to prosecute defendant at least five days before Officer M. notified Sanderson she was willing to testify, Sanderson admitted that the decision depended upon her willingness.

Three weeks later, defendant moved for dismissal of all charges, arguing that the district attorney's receipt and use of defendant's statement to persuade Officer M. to testify violated the immunity agreement, as well as defendant's federal and state constitutional rights against self-incrimination.

Denying defendant's motion on November 9, 1987, the court found that the police department's admonition conferred use, as opposed to,

transactional immunity; that the district attorney was entitled to receive defendant's statement under Penal Code section 832.7; and "that there was an improper use but that it was improper only in the sense that it involved a certain risk to the defendant's position in this particular case . . . ."

Finally, the court stated: "In this case I find that the prosecutor did have evidence from an independent source and that source was untainted by the defendant's incriminatory statement . . . . But . . . I wish that the Legislature and appellate courts might give us more guidance on the matter of the particular problem presented by police officers and other persons who may be given a grant of immunity for statements that are coerced by threat of administrative action. The Legislature certainly could provide controls on Section 832.7 allowing the District Attorney perhaps to receive the statement but that it is not to be used beyond being lodged in his file as a matter of record. [¶] I don't particularly like to see done what was done here to push a witness even though that same witness might have been influenced by other sources than the incriminatory statement."

Defendant next sought to recuse Deputy District Attorney Sanderson. The court granted the motion on April 13, 1988, finding that Sanderson's recounting of portions of the immunized statement to Officer M. "is a misuse of the statement and is contrary to the agreement entered into with the defendant when the statement was made." The court ordered that Sanderson not communicate to anyone facts he learned from defendant's immunized statement, that copies of the immunized statement be removed from the district attorney's file and returned to the department, and that the prosecution of defendant be handled by a prosecutor having no knowledge of the contents of the immunized statement. Thereafter, Deputy District Attorney Margo Smith entered the case.

In early June 1988, the case was assigned to another department for trial. Defendant again moved to dismiss, this time asserting that the district attorney's and Officer M.'s knowledge of defendant's immunized statement had irreparably tainted the proceedings.

The court heard testimony from, among others, Sanderson, Smith, and Officer M. As he had done previously, Sanderson testified that he listened to the tape of defendant's immunized statement to Adkins before filing the criminal complaint. By the time of the preliminary hearing, Sanderson had also heard tapes of Adkins's two interviews with Officer M. After discovering that defense counsel had transcripts of those interviews at the preliminary hearing, Sanderson requested and received from the police department transcripts of Adkins's interviews of defendant and Officer M., as well as a transcript of a second immunized statement taken from defendant on July

10, 1987. Sanderson also testified that he told Officer M. details of defendant's statement before she decided to testify. He could recall only one such detail, however, which had also figured in Adkins's follow-up interview with Officer M.

Smith testified that she had neither read nor heard defendant's immunized statement. She had read the two transcripts of Adkins's meetings with Officer M., however, including the follow-up interview in which Adkins focused on details from defendant's statement. She had also read the transcript of the preliminary hearing, in which defense counsel cross-examined Officer M. using the transcripts of her meetings with Adkins. In order to prepare Officer M. for her testimony, Smith provided her with a transcript of the preliminary hearing as well as transcripts of her interviews with department members, including the two meetings with Adkins.

Officer M. testified that she read the transcript of the preliminary hearing but did not have time to read most of the remaining materials, including the transcripts of her meetings with Adkins. She recalled that, during her conversations with Sanderson before the complaint was filed, Sanderson suggested defendant had lied in his immunized statement. Sanderson did not reveal any details of the statement until later, however, before the preliminary hearing. She could not remember those details, although she admitted on cross-examination that the details surprised and angered her.

Defendant argued the case should be dismissed because improper uses of defendant's immunized statement had irremediably tainted the proceedings. Defendant argued the taint had permeated every aspect of the case—beginning with Officer M.'s decision to testify and the district attorney's decision to prosecute and continuing one year later when Smith read and provided Officer M. with transcripts of the preliminary hearing and the Adkins follow-up interview with Officer M., both of which contained details of defendant's immunized statement. Defendant suggested that the taint resulted from a blurring of the line separating the police department's criminal investigation from its internal investigation.

The People argued there were legitimate independent sources of information for the criminal case against defendant. Noting that, after defendant gave his immunized statement to Adkins, he volunteered to Lt. Skalland much the same story in a nonconfidential interview, the People contended that defendant's statement to Skalland was gratuitous and unprotected by *Lybarger* immunity. The People also argued that defendant may have waived his immunity when he attempted to impeach Officer M.'s testimony at the preliminary hearing by using the transcript of her follow-up interview with Adkins, which contained details of the immunized statement. The

People also offered to prove that defense counsel had actually invited the district attorney's use of the immunized statement by requesting that the district attorney's office review the police department's internal affairs unit file before deciding to file charges.[3]

The court granted defendant's motion to dismiss. It found "[n]o doubt about it that the statement was taken pursuant to *Lybarger* . . . . The officer was promised that there would be no use whatsoever of the statement. Just giving statement to preserve his employment. And the statement was used and the statement was turned over to the district attorney's office. And the deputy that had that statement is the same deputy that put on the preliminary examination, directed the testimony. [¶] But I'm also . . . fully aware . . . the defense lawyer used those statements to conduct the cross-examination. I mean everything that's in those statements is covered by the cross-examination of the complaining witness. [¶] The water gets further muddied by the statement . . . given to Lieutenant Skalland. And certain portions of [defendant's] statement under oath to Lieutenant Atkins [*sic*] . . . is a statement voluntarily given in the Skalland report. [¶] Question that comes down to the court, is that sufficient to remove the taint or place [defendant] in a situation if he went to trial he would have been if he had not given the statement to Internal Affairs. [¶] I'm not satisfied the taint has been removed."

As the proceedings concluded, Smith asked: "Is this pursuant to section 1385?" The judge responded: "Yes. This will be pursuant to 1385." The court's minute order stated: "The Court finds the People have not met their burden of proof. The case is dismissed under 1385 of the Penal Code."[4]

DISCUSSION

I. *Appealability*

█ The People's appeal from the dismissal order is statutorily authorized. (Pen. Code, § 1238, subd. (a)(8).) Defendant purports to cross-appeal

---

[3]The People offer several waiver arguments on appeal and suggest that, in the interests of justice, we remand for a full evidentiary hearing on waiver. Because we reverse the trial court's order of dismissal on other grounds, we leave the waiver question for resolution by the trial court should the issue again be presented.

[4]Although the People suggested Penal Code section 1385 as a basis for dismissal, they now argue that dismissal under that statute was improper because defendant initiated the motion. The statute speaks of dismissal on the judge's own motion or upon application of the prosecutor. The People also contend that the order of dismissal did not satisfy the Penal Code section 1385 requirement that "reasons for the dismissal must be set forth in an order entered upon the minutes." Because we determine that the trial court's order was erroneous on the merits we do not decide whether the court's power to dismiss in this circumstance is based on Penal Code section 1385, or, if so, whether the procedural requirements of that provision were satisfied.

from the same order in an effort to preserve and argue all grounds for affirming the dismissal order. Defendant's appeal is unauthorized and must be dismissed. (See Pen. Code, §§ 1237, 1237.5; 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) § 3174, p. 3930.) As defendant suggests, however, we shall consider whether reasons other than that articulated by the trial court support its order of dismissal.

## II. *From Counselman to Kastigar*

Historically, government officials have employed several forms of immunity in order to compel testimony from unwilling witnesses who invoke the privilege against compulsory self-incrimination guaranteed by the federal constitution (U.S. Const., 5th Amend.) and by state constitutions (e.g., Cal. Const., art. I, § 15). We begin with a brief overview of United States Supreme Court immunity cases, which provide precedent and perspective for our disposition of the issues at hand.

In *Counselman* v. *Hitchcock* (1892) 142 U.S. 547 [35 L.Ed. 1110, 12 S.Ct. 195], the Supreme Court struck down a federal statute providing "direct use" immunity. The most limited form of immunity, direct use immunity prohibits only the actual use in a subsequent prosecution of the statement made or evidence produced under compulsion. (*Id*. at p. 564 [35 L.Ed. at p. 1114].) Because the compelled statement could be used to search out other testimony or evidence to be used against the witness in a criminal proceeding, the court held that it was not sufficiently protective of the Fifth Amendment privilege against self-incrimination.

Four years later, the Supreme Court upheld "transactional" immunity in *Brown* v. *Walker* (1896) 161 U.S. 591 [40 L.Ed. 819, 16 S.Ct. 644]. (See *Ullmann* v. *United States* (1956) 350 U.S. 422, 430 [100 L.Ed. 511, 520, 76 S.Ct. 497, 53 A.L.R.2d 1008].) At the other end of the spectrum from direct use immunity, transactional immunity precludes prosecution for the offense to which the compelled statement or evidence relates. In effect, it operates as a pardon. (See *Brown* v. *Walker, supra*, 161 U.S. at p. 595 [40 L.Ed. at p. 820].)

After *Counselman* and *Brown*, it appeared that the only acceptable form of immunity was transactional. (See *United States* v. *Murdock* (1931) 284 U.S. 141, 149 [76 L.Ed. 210, 213-214, 52 S.Ct. 63, 82 A.L.R. 1376], overruled on other grounds in *Murphy* v. *Waterfront Comm'n.* (1964) 378 U.S. 52, 77 [12 L.Ed.2d 678, 694, 84 S.Ct. 1594]; *Hale* v. *Henkel* (1906) 201 U.S. 43, 67 [50 L.Ed. 652, 662, 26 S.Ct. 370].) In *Counselman*, the court admonished that no statute can supplant a constitutional privilege, "at least unless it is so broad as to have the same extent in scope and effect." (*Counselman*

v. *Hitchcock, supra*, 142 U.S. at p. 585 [35 L.Ed at p. 1122].) Expansive language in *Counselman* suggested that use immunity was unacceptable in any form. (See, e.g., *id.* at p. 586 [36 L.Ed at p. 1122] ["In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates."].) But more than 70 years later, the Supreme Court upheld a federal statute providing a form of use immunity.

In *Kastigar* v. *United States* (1972) 406 U.S. 441, 453 [32 L.Ed.2d 212, 221-222, 92 S.Ct. 1653], the court held that the government can compel testimony from an unwilling witness who invokes the Fifth Amendment privilege against compulsory self-incrimination by conferring "use and derivative use" immunity upon the witness. Such immunity bars use of the compelled testimony, or of evidence derived therefrom, in subsequent criminal proceedings. The court rejected the argument that only transactional immunity can override the Fifth Amendment privilege, finding that such immunity provides broader protection than the privilege requires. The court found use and derivative use immunity to be coextensive with the scope of the Fifth Amendment privilege, thus leaving the government and the witness in substantially the same positions they would have occupied had the witness simply claimed the privilege. (*Id.* at pp. 458-459 [32 L.Ed.2d at pp. 224-226]; see also *Murphy* v. *Waterfront Comm'n., supra*, 378 U.S. 52, 79 [12 L.Ed.2d 678, 695].) The court analogized the restrictions on use immunity to the restrictions on coerced confessions, which are inadmissible as evidence but do not prohibit prosecution. (*Kastigar, supra*, 406 U.S. at p. 461 [32 L.Ed.2d at pp. 226-227].)

 Under the system of use and derivative use immunity approved in *Kastigar*, the government may prosecute a witness for a crime to which the immunized testimony relates. But if the witness, now defendant, challenges the source of government evidence, the prosecution has an "affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." (*Kastigar* v. *United States, supra*, 406 U.S. at p. 460 [32 L.Ed.2d at p. 226].) While *Kastigar* speaks of the prosecutor's "heavy burden" in this regard (*id.* at p. 461 [32 L.Ed.2d at pp. 226-227]), a majority of courts to consider the issue have held that the prosecutor need show only by a preponderance of the evidence that the evidence adduced against defendant is derived from legitimate independent sources. (See, e.g., *United States* v. *Byrd* (11th Cir. 1985) 765 F.2d 1524, 1529; *United States* v. *Rogers* (9th Cir. 1983) 722 F.2d 557, 560; *United States* v. *Seiffert* (5th Cir. 1974) 501 F.2d 974, 982.)

III. *Lybarger*

In *Lybarger* v. *City of Los Angeles, supra*, 40 Cal.3d 822, the California Supreme Court employed use and derivative use immunity to harmonize

provisions of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.).[5] Government Code section 3303 establishes the "conditions" of interrogation "[w]hen any public safety officer is under investigation and subjected to interrogation by his commanding officer, or any other member of the employing public safety department, which could lead to punitive action," defined as "any action which may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." Government Code section 3303 contains two seemingly incompatible subdivisions.

Subdivision (e) provides: "The public safety officer under interrogation shall not be . . . threatened with punitive action, except that an officer refusing to respond to questions or submit to interrogations shall be informed that failure to answer questions directly related to the investigation or interrogation may result in punitive action." The *Lybarger* court approved this provision, noting that "[a]s a matter of constitutional law, it is well established that a public employee has no absolute right to refuse to answer potentially incriminating questions . . . ." (40 Cal.3d at p. 827.)

Subdivision (g) provides: "If prior to or during the interrogation of a public safety officer it is deemed that he may be charged with a criminal offense, he shall be immediately informed of his constitutional rights." The *Lybarger* court construed this to mean that an officer who may be prosecuted must be advised of his *Miranda* rights, including the right to remain silent. (*Id.* at p. 829; see *Miranda* v. *Arizona, supra,* 384 U.S. at pp. 467-468 [16 L.Ed.2d at pp. 719-720].)

The court reconciled these provisions through the device of use and derivative use immunity. The court held that Officer Lybarger "should have been told, among other things, that although he had the right to remain silent and not incriminate himself, (1) his silence could be deemed insubordination, leading to administrative discipline, and (2) any statement made

---

[5] California courts have adopted use and derivative use immunity to protect the constitutional rights of declarants in various settings. (See, e.g., *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789] [statements made by minor to probation officer or during fitness hearing may not be introduced as substantive evidence against minor at trial]; *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024] [except for purposes of impeachment or rebuttal, testimony at probation violation hearing is inadmissible in subsequent trial on criminal charges arising out of alleged violation of probation conditions]; *In re Jessica B.* (1989) 207 Cal.App.3d 504 [254 Cal.Rptr. 883] [parent's admissions during dependency proceedings or court-ordered therapy inadmissible in criminal trial for child abuse].)

As to the continuing validity of use and derivative use immunities adopted before the enactment of California Constitution article I, section 28, subdivision (d) (Prop. 8), on June 9, 1982, see *Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at pages 806-811, and *In re Jessica B., supra,* 207 Cal.App.3d at pages 519-520.

under the compulsion of the threat of such discipline could not be used against him in any subsequent criminal proceeding." (*Lybarger* v. *City of Los Angeles, supra,* 40 Cal.3d at p. 829.)

The adoption of use and derivative use immunity in *Lybarger* was intended to achieve a balance of interests by encouraging full cooperation with police department internal investigations of criminal offenses and, at the same time, by protecting the constitutional rights of officers under investigation. (40 Cal.3d at p. 828.) In that way, "the right to remain silent is not a 'hollow' right: It may be exercised without fear of *penal* sanction." (*Ibid.*; see also *Williams* v. *City of Los Angeles* (1988) 47 Cal.3d 195, 200 [252 Cal.Rptr. 817, 763 P.2d 480] [case involving Officer Lybarger's partner in which the court referred to "the qualified nature of his right to remain silent . . ."].)

IV. *Beyond Lybarger*

The parties to this action do not dispute that, under *Lybarger,* defendant was entitled to use and derivative use immunity for his statement to Adkins or that defendant received a proper immunity admonition. This case takes us a step beyond *Lybarger.* Defendant contends that the district attorney's office should not have received the immunized statement and that it breached the immunity agreement by using the statement to persuade Officer M. to testify and to exercise its prosecutorial discretion. Defendant also maintains that the criminal proceedings are irreparably tainted because the district attorney's and Officer M.'s advance knowledge of defendant's version of events impermissibly lightens the prosecution's burden in preparation and trial of this case. (See *People* v. *Coleman, supra,* 13 Cal.3d 867, 876.)

Although the adoption in *Lybarger* of use and derivative use immunity resolved the apparent conflict between subdivisions (e) and (g) of Government Code section 3303, the instant case vividly demonstrates yet another tension resulting from the application of *Lybarger*—that is, the inherent tension arising from the simultaneous conduct of administrative and criminal proceedings. The indisputable import of *Lybarger* is that the two actions may, in fact, proceed simultaneously. Certainly, the criminal action need not be delayed. And if administrative action had to await the conclusion of criminal proceedings, the system of use and derivative use immunity adopted in *Lybarger* would be pointless. (Cf. *People* v. *Coleman, supra.*) Hence, the proceedings may occur side by side and, ideally, they would move along entirely separate tracks, each progressing as though the other did not exist. But reality necessarily falls short of this ideal because the two investigations involve the same events and, therefore, the same victims and the same witnesses.

Under *Lybarger*, the officer's statement is protected within the context of criminal proceedings but not within the context of administrative proceedings. As a consequence, victims and witnesses participating in administrative proceedings will frequently and necessarily be exposed to defendant's immunized statement. In this case, for example, the immunity admonition informed defendant that his statement could not be "used against you in any subsequent criminal proceedings" but that the statement may "be used against you subsequently . . . in relation to departmental charges." Defendant could foresee that Officer M., the purported victim and a participant in departmental proceedings, would likely be exposed to his version of events. Indeed, Officer M. was exposed to information from defendant's statement during her follow-up interview with Adkins as part of the administrative investigation.

Ideally, a victim or witness exposed to an immunized statement during administrative proceedings would somehow be sanitized before participating in criminal proceedings. But neither law nor science has perfected a means of instantly expunging selected information from the human mind. (See *United States* v. *McDaniel* (8th Cir. 1973) 482 F.2d 305, 312.) So long as administrative and criminal investigations proceed simultaneously, as *Lybarger* tells us they may, victims and witnesses will necessarily carry a "taint" into the criminal arena.

## V. *Penal Code Section 832.7*

█ The trial court ruled that the district attorney had a right to receive defendant's immunized statement under Penal Code section 832.7. The court's later dismissal based on "taint" did not rely directly upon the statutory ruling and, as we explain in section VI., *post*, the question whether the district attorney had a statutory right to defendant's statement is only peripherally related to the dispositive *Kastigar* issue. Nonetheless, we begin our review with an examination of Penal Code section 832.7 in order to rule out a potential threshold basis for dismissal and to provide necessary guidance to law enforcement.

Penal Code section 832.7, subdivision (a), provides that "[p]eace officer personnel records . . . , or information obtained from these records, are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code. This section shall not apply to investigations or proceedings concerning the conduct of police officers . . . conducted by a grand jury, a district attorney's office, or the Attorney General's office."

As recited by Adkins, the immunity admonition in this case promised that the "statement will be held confidential consistent with Penal Code

section 832.7, and will not be divulged except as required by law." Thus, the admonition referred specifically to Penal Code section 832.7, and defendant does not dispute that his statement to Adkins during the internal investigation became a part of his personnel record. But the admonition also imparted notice to defendant, who was represented by counsel, that the district attorney would have access to the statement. In the words of the admonition, Penal Code section 832.7 "required by law" that the statement be made available to the district attorney.

Defendant contends that, in adopting Penal Code section 832.7 several years before *Lybarger*, the Legislature did not contemplate this situation and that the statute should not be construed to cover a statement protected by *Lybarger* immunity. In our view, the statutory language is clear, however, and does not conflict with the essential holding of *Lybarger* that the statement must not be *used* against defendant in criminal proceedings. As discussed in section VI, *post*, mere knowledge of the statement—on the part of the prosecutor or a witness—is not the equivalent of use.

■ We are compelled, however, to add the following caveat: Although the district attorney may have a statutory right under Penal Code section 832.7 to obtain a police officer's immunized statement, we do not hold that the district attorney must or should receive such a statement. Depending on the nature of the immunized statement and the circumstances of a given case, a district attorney with knowledge of defendant's immunized statement may be unable to show that a criminal case can be prosecuted without use of the statement. For this reason, the district attorney's decision whether to receive an immunized statement under the authority of Penal Code section 832.7 should be made in contemplation of the risk involved.

## VI. The "Taint" Dismissal

■ We conclude the trial court erred in dismissing the information at this early stage under the circumstances of record. The court correctly defined the general test to be applied—whether defendant could be tried as if he had not made the immunized statement—and correctly placed the burden of proof on the People. But the court's comments and decision indicate that it focused on an undifferentiated "taint" flowing from prosecution and witness exposure to defendant's immunized statement, rather than on the precise question whether the evidence the People proposed to introduce at trial derived from sources independent of defendant's statement.

Contrary to the trial court's frame of reference, "taint" alone does not require dismissal of criminal charges. Indeed, as discussed above, some "taint" is the inevitable result of parallel administrative and criminal

proceedings and of the prosecutor's knowledge of the statement. What *Kastigar* proscribes is "any use, direct or indirect," of the immunized statement. Therefore, in order for there to be a violation of a use immunity agreement, there must be a prohibited "use." "The question under *Kastigar* is not whether the [immunized] testimony relates to the [criminal] charges [fn. omitted], but whether the prosecution has 'used' the testimony in prosecuting those charges." (*United States* v. *McDaniel, supra,* 482 F.2d at p. 310 [both evidentiary and nonevidentiary use proscribed]; *U. S.* v. *Crowson* (9th Cir. 1987) 828 F.2d 1427, 1431-1432, cert. den. (1988) 488 U.S. 831 [102 L.Ed.2d 63, 109 S.Ct. 87] [only evidentiary use proscribed]; see also discussion in *United States* v. *North* (D.C. Cir. July 20, 1990, amended Aug. 22, 1990) 920 F.2d 940 [Dock. No. 89-3118] regarding differences between evidentiary and nonevidentiary uses, and surveying relevant cases.) The keystone is actual use, not potential use—impropriety itself, not the appearance of impropriety.

Thus, a prosecutor's mere access to defendant's immunized statement does not call for dismissal. On occasion, the prosecution or the court may decide to remove a particular prosecutor from the case, as the court did here, in order to insure against the use of immunized testimony. (See *United States* v. *Semkiw* (3d Cir. 1983) 712 F.2d 891, 895.) But that action may be unnecessary. In *U.S.* v. *Crowson, supra,* 828 F.2d 1427, the Ninth Circuit followed other federal courts in refusing to create a per se rule that would require the withdrawal of a prosecutor who is privy to compelled testimony. " 'The focus of the inquiry under *Kastigar* . . . is not whether the prosecutor was aware of the contents of the immunized testimony, but whether he used the testimony in any way to build a case against the defendant.' " (*Id.* at p. 1430, quoting from *United States* v. *Caporale* (11th Cir. 1986) 806 F.2d 1487, 1518, cert. den. (1987) 483 U.S. 1021 (97 L.Ed.2d 763, 107 S. Ct. 3265); accord *U. S.* v. *Mariani* (2d Cir. 1988) 851 F.2d 595, 601; United States v. *Byrd, supra,* 765 F.2d at p. 1530 [". . . *Kastigar* made no mention of any burden on the government to erect an impenetrable barrier between the prosecutors who hear or read the immunized testimony and those who decide to indict . . . ."].) In this case, for instance, the question whether the district attorney had a right to receive defendant's immunized statement under section 832.7 has little bearing upon the *Kastigar* inquiry. Regardless how the exposure occurred—whether properly or improperly—the question remains whether the prosecutor has used defendant's immunized statement in furtherance of criminal proceedings.

Just as a prosecutor's knowledge of the contents of defendant's immunized statement does not necessarily require recusal of the prosecutor, so also a witness's knowledge does not necessarily nullify the witness's testimony. As the court observed in *U. S.* v. *Poindexter* (D.D.C. 1988) 698

F.Supp. 300, 314, a witness's exposure to immunized testimony does not constitute "an incurable disease . . . . [T]he defendants' Fifth Amendment rights are not infringed if a witness hears immunized testimony and yet testifies solely to facts personally known to the witness." (See also *State* v. *Strong* (1988) 110 N.J. 583 [542 A.2d 866, 876] ["Factors influencing a witness to come forward, such as his wholly fortuitous knowledge of the defendant's compelled testimony . . . , do not engender the same protective concern over the improper use of compelled testimony."]; cf. *People* v. *Hayes* (1989) 49 Cal.3d 1260, 1272-1273 [265 Cal.Rptr. 132, 783 P.2d 719] [victim may testify regarding events recalled and related before hypnotic session, as well as subjects not discussed during hypnosis].)

■■ Although the trial court's decision appears to rest on "taint" alone, it may also imply a conclusion that, inevitably, the People must make use of defendant's immunized statement and that the People have not demonstrated otherwise. But the record, taken as a whole, does not support such a finding. For instance, the record shows that on April 18 and 19, 1987, *before* Officer M. learned any details of defendant's statement, she made recorded statements detailing her version of events. Officer M.'s recorded statements furnish a means for determining whether her testimony at trial is altered or directed in such a manner as to disclose the use of defendant's statement. Further, comparison of the statements of Officer M. and defendant does not readily suggest the prosecution will use defendant's immunized statement in order to gain evidentiary leads or strategic advantage.

The Ninth Circuit cautioned in *U. S.* v. *Crowson*, *supra*, 828 F.2d at pages 1431-1432: "to require that a . . . wall be erected between the immunized testimony and the prosecution would be the equivalent of granting transactional immunity . . . ." (Accord *United States* v. *Byrd*, *supra*, 765 F.2d at p. 1531 ["The mere theoretical possibility of an eventual *Kastigar* violation at trial is no grounds for dismissing the indictment."].) To dismiss the criminal charges under the present circumstances of this case is, indeed, to convert defendant's use and derivative use immunity into transactional immunity. Such a result is not in keeping with the letter or spirit of *Lybarger* or *Kastigar*.

■■ But again we must add a caution. Although the natural "taint" resulting from the district attorney's access to defendant's immunized statement under Penal Code section 832.7 and the witness's knowledge acquired through administrative proceedings does not mandate automatic dismissal, neither shall this natural "taint" infect the criminal proceedings. The immunity admonition in this case promised defendant that statements made "under the compulsion or threats of such discipline cannot be used against you in any subsequent criminal proceedings." The district attorney is bound

by this immunity agreement and may not use defendant's statement to advance the criminal prosecution in any way.

Like any prosecutor having access to an immunized statement, the district attorney who obtains a statement under Penal Code section 832.7 must develop, prepare, and present the criminal case without reference to defendant's immunized statement. The prosecutor must instruct victims and witnesses to assiduously avoid testimonial reference to information gained through exposure to defendant's statement. If and when the prosecutor appears to elicit or introduce evidence directly or indirectly derived from defendant's immunized statement, defendant will have cause to complain and the prosecutor will have to demonstrate, pursuant to *Kastigar*, that the evidence derives from a source independent of defendant's statement. (*United States* v. *Byrd, supra,* 765 F.2d at p. 1531; see also *United States* v. *North, supra,* 920 F.2d 940 (Dock. No. 89-3118) [trial court should make specific findings]; *U. S.* v. *Poindexter* (D.D.C. 1989) 727 F.Supp. 1488, 1496 [discussing methods of dealing with *Kastigar* issues during and after trial].)

## VII. *Initiation of Criminal Proceedings*

■ Defendant contends a valid, alternative reason supports the trial court's order of dismissal and, therefore, affirmance is proper even if the court cited an erroneous reason for its order. (See *People* v. *Gibson* (1987) 195 Cal.App.3d 841, 853 [241 Cal.Rptr. 126].) Defendant argues that the district attorney's office improperly used the immunized statement in persuading Officer M. to testify and in exercising its prosecutorial discretion. As noted above, the trial court rejected defendant's earlier motion to dismiss on this basis, ruling that Officer M.'s decision to testify and the district attorney's decision to prosecute derived from legitimate sources independent of defendant's immunized statement.

In ruling upon defendant's motion to dismiss based on the initiation of criminal proceedings, the trial court reviewed testimony from the preliminary and subsequent hearings. We find that this record substantially supports the trial court's conclusion that Officer M.'s decision to testify emanated from a legitimate independent source.

At the preliminary hearing, Officer M. testified that she spoke with several people in an effort to make up her mind about testifying. She spoke to the president and to another board member of the women's police officers association, to an attorney, to the San Jose Chief of Police, and to her roommate, who was also a police officer. She said that none of them told her what to do, but they helped her weigh the pros and cons. On the pro side was a belief that defendant would be prosecuted if he were a private citizen.

Weighing against her decision to testify was the ordeal of going through a criminal trial and the possible negative effect on her career as a police officer.

Officer M. testified that she made up her mind about testifying approximately two weeks after the last incident. She was asked on cross-examination, "What was it that changed your mind?" Answer: "Realizing that if we were talking about citizens, it would definitely be prosecuted." Defense counsel asked whether it "[h]ad nothing to do with any rumors that you heard or any statements attributed to [defendant] about you; that didn't have anything to do with it, did it?" Answer: "No."

Sanderson testified that, during his early conversations with Officer M., she appeared "surprised" and "hurt" that defendant had not told Adkins the same story she had. "Q. You feel that by her hearing from you some of the statements that [defendant] made, it hardened her position or at least led her to take the position that she would support or encourag[e] a criminal prosecution? [¶] A. Yes, and no. [¶] Q. How yes, how no? [¶] A. Yes, in the sense I have to believe it ultimately weighed in her decision to cooperate with the criminal prosecution. No, in the sense that she did not immediately upon hearing the statements want to pursue it criminally. In fact I believe there was at least a number of days if not a week gap."

Officer M.'s testimony amply supports the trial court's finding that defendant's statement did not motivate her to testify against him. Her explanation of her decision process is credible. Her initial period of indecision is also understandable. Granted, "[h]uman motivation is often difficult to discern, and a decision is frequently the product of several concurrent influences." (*United States* v. *Kurzer* (2d Cir. 1976) 534 F.2d 511, 517.) But Officer M. firmly denied that defendant's statement weighed in her decision to testify. While Sanderson may have believed that defendant's statement influenced Officer M.'s decision, her adamant denial provides substantial support for the trial court's decision. Moreover, Sanderson suggested that defendant's statement influenced Officer M. to testify, not so much because of specific details but because of her "surprise" and "hurt" that defendant told Adkins a different story. Surely Officer M. could have deduced that she and defendant were telling different stories simply by virtue of the ongoing administrative proceedings—a legitimate independent source of information.

In the hearing on defendant's second motion to dismiss, defendant purported to renew his motion to dismiss based on the initiation of criminal proceedings. There was ample additional evidence in the second hearing

that Officer M.'s decision to testify against defendant emanated from an independent source.

Unlike the judge who issued the earlier order, the second judge had before him the transcripts of Officer M.'s interviews with Adkins and Stangel. Although Officer M. expressed indecision to both investigators about whether defendant should be prosecuted, she also indicated she was not entirely averse to testifying against him in criminal proceedings. She told Stangel: "I mean if need be, I definitely will."

The court questioned Officer M.: "Before the criminal action was instituted, before a complaint was filed, evidently there was—I'm assuming there was indecision on your part. You had a conversation with Dale Sanderson, and during the course of that conversation you had with Dale Sanderson, he relayed certain information to you that made you decide that you would be a willing witness for the People in a prosecution. Is there anything wrong with that assumption?" Officer M.: "Dale did not talk me into going criminal." The court: "He did not mention anything to you during that time period that I just mentioned to you at all about anything that occurred in internal affairs that in any way affected your decision?" Officer M.: "He did not."

We note that on the several occasions they testified, Sanderson and Officer M. disagreed as to the amount and nature of information Sanderson related about defendant's immunized statement. It is clear, however, that some information was conveyed. By this decision, we do not intend to condone the district attorney's conduct, but only to recognize that improper conduct alone does not warrant the dismissal of criminal charges under *Kastigar*. Rather, a use must be effective in order to warrant dismissal. In this case, the district attorney conveyed information to the alleged victim, but the question remains whether her decision to testify resulted from that information. Unlike the exclusionary rule (see *United States* v. *Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571-572, 94 S.Ct. 613]), the *Kastigar* rule is not intended to deter improper conduct—although that result will likely follow—but to prevent criminal prosecutions that are genuinely tainted through breach of immunity agreements.

Nor are we troubled by the fact that the district attorney may have conditioned the decision to prosecute upon Officer M.'s willingness to testify. Sanderson testified that the district attorney's office decided to prosecute defendant at least five days before Officer M. notified Sanderson she would be willing to testify. But the decision was conditional: "The only thing holding it back was whether or not we had a willing victim. If we did not have a willing victim, we obviously do not pursue. It would be ridiculous."

■ Government Code section 26501 requires a district attorney to "institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses when he has information that such offenses have been committed." A district attorney's office is not required, however, "to dissipate its effort on personal grievance, fanciful charges and idle prosecution." (*People* v. *Municipal Court* (1972) 27 Cal.App.3d 193, 205 [103 Cal.Rptr. 645, 66 A.L.R.3d 717].)

Unlike the victims of other crimes, the victim of a sexual assault may refuse to testify without risking penalty. Pursuant to Code of Civil Procedure section 1219, subdivision (b), "no court may imprison or otherwise confine or place in custody the victim of a sexual assault for contempt when the contempt consists of refusing to testify concerning that sexual assault." In the absence of other admissible evidence of the crime, the district attorney may decide to forgo prosecution if the victim of a sexual assault is unwilling to testify.

In this case, Officer M.'s testimony is critical. It was reasonable and prudent for the district attorney to take into account her willingness to testify. The district attorney's conditional decision did not constitute an improper transfer of prosecutorial discretion, as defendant suggests, but a prudent avoidance of idle prosecution.

### DISPOSITION

The order of dismissal is reversed. Defendant's cross-appeal is dismissed.

Capaccioli, J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied October 12, 1990, and the petition of appellant Gwillim for review by the Supreme Court was denied November 28, 1990. Broussard, J., and Panelli, J., were of the opinion that the petition should be granted.