[No. B211975. Second Dist., Div. Four. Feb. 22, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOSEPH SINGLETON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts B through D.4. of the Discussion.

2

4

▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮

COUNSEL

Charles M. Sevilla for Defendant and Appellant.

Lackie, Dammeier, & McGill and Steven J. Brock for Peace Officers Research Association of California Legal Defense Fund as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan D. Martynec and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MANELLA, J.**—Appellant Michael Joseph Singleton, a former police officer, was charged with assaulting an arrestee and filing a false report about the arrest. He was investigated by his employer and gave a compelled statement, after being advised, pursuant to *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822 [221 Cal.Rptr. 529, 710 P.2d 329] (*Lybarger*), that it would not be used against him in a criminal trial. The prosecutor called David Weldon, the person who investigated the incident, to opine whether appellant had control of the arrestee during a portion of the arrest depicted in a video recording. In the published portion of the opinion we conclude that the testimony did not violate the principles articulated in *Kastigar v. United States* (1972) 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653] (*Kastigar*) regarding the treatment of witnesses exposed to compelled statements. We further find that Weldon was qualified to give the limited expert opinion he provided and that appellant was not denied an opportunity to effectively cross-examine him. We affirm.

## PROCEDURAL BACKGROUND

On September 4, 2007, an information was filed charging appellant Michael Joseph Singleton in count 1 with assault by a police officer on Jose Bernal (Pen. Code, § 149), and in count 2 with filing a false report (Pen. Code, § 118.1). Appellant pleaded not guilty to the charges. His first trial ended in a mistrial after the jury deadlocked and was unable to reach a verdict, with nine of the jurors having voted to acquit appellant.

Appellant's second trial was also by jury. On June 18, 2008, the jury found appellant guilty as charged. As to count 1, the trial court suspended sentence and placed appellant on formal probation for three years, with the condition

that appellant serve 365 days in the county jail. As to count 2, the trial court sentenced appellant to a consecutive term of 180 days in the county jail.

## FACTUAL BACKGROUND

### A. *Prosecution Evidence*

#### 1. *Initial Arrest*

On April 1, 2004, Joseph Densmore became a probationary police officer and trainee with the Maywood Police Department. In early May 2004, appellant replaced another officer as Densmore's field training officer. Shortly after 8:00 p.m. on May 13, 2004, appellant and Densmore were driving in a patrol car when they responded to a disturbance involving Jose Uribe and Jose Bernal.

Regarding the disturbance, Uribe testified that when he arrived at his home in Maywood on May 13, 2004, he found Bernal in an angry state and threatening to hit Uribe's son. When Bernal threw punches at Uribe, Uribe dodged the blows, and punched Bernal. With the assistance of another person, Uribe restrained Bernal until the police arrived. According to Uribe, when the police officers appeared, Bernal was initially calm and cooperative, but became profane and violent after being placed in the patrol car. Bernal had only a slightly swollen cheek when the officers left with him in the patrol car.

Bernal testified that he is five feet nine inches tall, and at the time of the incident weighed 235 pounds. Prior to his encounter with Uribe, he drank "[m]aybe two 40 ouncers" of beer. When he discovered that Uribe's son had disturbed some garbage cans, he went to Uribe's residence to complain. There, Uribe's relative placed him in a choke hold while Uribe repeatedly punched him. According to Bernal, the punches did not cut or injure him. Several police officers arrived, including appellant and Densmore, and arrested Bernal. Bernal became angry when the officers failed to inquire into the misconduct of Uribe's son, and Bernal spat at an officer. He was handcuffed and placed in the rear seat of appellant and Densmore's patrol car.

The parties stipulated that on May 13, 2004, Uribe placed Bernal under citizen's arrest for battery.[1]

#### 2. *Use-of-force Incident*

The key prosecution witnesses to Bernal's journey to the police station were Densmore and Bernal. Densmore testified as follows: After he and

---

[1] The parties also stipulated that before and after the arrest, Bernal had hostile encounters with Maywood Police Department officers other than appellant and Densmore, and that he was convicted of felony burglary in 2004.

appellant arrived at the scene of the disturbance, appellant told him to put Bernal in the backseat of the patrol car. Although Densmore had been instructed in the police academy to restrain arrestees with seatbelts, his initial field training officer told him not to follow this practice, and thus Densmore did not apply seatbelts to Bernal. When Densmore put Bernal in the car, Bernal had only minor facial injuries.

While Bernal sat in the car awaiting its departure, he threatened an officer other than appellant or Densmore. Nonetheless, when the car left, Bernal was quiet. After appellant drove the car approximately one-half mile, he accelerated it and applied the brakes, causing Bernal, who was handcuffed, to slam into a metal screen shielding the officers, who sat in the front seats. Bernal became upset and swore profusely at the officers. Appellant accelerated and braked the car three or four times.

When the car arrived at the police station, appellant drove toward the sally port—that is, the prisoners' entrance—and instructed Densmore to get out and grab Bernal, who was then quiet.[2] After the car stopped, Densmore and appellant placed their guns in the car's trunk, as they were not permitted to carry guns inside the jail. Appellant and Densmore then approached the passenger side of the car, where Bernal was seated. Densmore was not significantly apprehensive about Bernal, who remained handcuffed.

As Bernal stepped out of the car, appellant grabbed Bernal's arm and pushed him up against the station wall. As appellant did so, he angrily criticized Densmore for failing to grab Bernal. While Densmore continued to stand apart, appellant pulled Bernal toward the jail door at a rapid walking pace. According to Densmore, Bernal appeared to be cooperative.

As the pair approached the jail door, appellant increased his pace, placed his forearm on Bernal's neck, and drove Bernal at a downward angle into a wall. Densmore saw no aggressive conduct by Bernal. After Bernal hit the wall, his head bounced back into appellant, and the pair fell to the ground. According to Densmore, Bernal appeared to be unconscious. While Bernal was in this state, appellant applied a "carotid restraint" chokehold to him for three seconds, and then punched him.

After appellant stopped and stood up, Bernal remained on the ground, inert and bleeding from his ear and nose. Appellant was upset with Densmore, and said to him, "This does not look good. You got to get in there and get your hands dirty." At appellant's direction, Densmore and appellant dragged Bernal into a sitting position against the wall, and appellant called for paramedics.

---

[2] The parties entered into a stipulation regarding the dimensions of the sally port area.

After approximately five minutes, Bernal regained consciousness. During Densmore's testimony, the jury viewed a video recording from a surveillance camera near the sally port, which captured portions of Bernal's arrival at the station preceding—but not including—the moment he suffered his injuries.

Bernal testified as follows: As appellant and Densmore drove him to the station, he angrily complained that he should not have been arrested and spat at appellant, but made no threats. However, by the time the car approached the station's sally port, he had calmed down. When the car stopped, Bernal stepped out of the car at appellant's direction. He engaged in no aggressive conduct toward appellant. Despite Bernal's compliance with appellant's instructions, appellant said, "I didn't tell you to step out of the car," and banged Bernal's head against a wall. Appellant then began to move Bernal toward the jail door. Bernal could remember only that he collapsed on the way to the door, and that he later awoke in an ambulance.

The parties stipulated that medical personnel who responded to the incident found that Bernal had a nasal fracture and other injuries to his face and head.

### 3. Subsequent Events

Regarding the events following Bernal's injuries, Densmore testified as follows: When an ambulance transported Bernal to a hospital, appellant accompanied Bernal while Densmore followed the ambulance in their car. Bernal was released from custody at the hospital.

As appellant and Densmore returned from the hospital, appellant asked Densmore, "How are you going to write this report? Because this is your report." When Densmore answered that he intended to describe the incident "exactly how [he] saw it," appellant said, "That's not going to be able to work because we're going to need to justify this force." After Densmore returned to the station, he prepared an accurate incident report. Appellant rejected it and instructed Densmore to use a handwritten description of the incident that appellant provided to Densmore.[3] Densmore prepared another draft of the report, which incorporated appellant's description of the incident. According to Densmore, appellant ultimately wrote the final version of the report, which Densmore initialed.

---

[3] Appellant read the description for the jury. According to appellant, the description stated: "Due to the violent behavior of Bernal and his attempts to injure officers, [appellant] placed Bernal in a Department-approved, academy trained [sic] carotid restraint. Bernal continued thrashing his body from left to right, yelling that he was not going to be arrested. Bernal lunged forward, losing his balance, and fell head[]first, hitting the wall near the detective's door. Bernal appeared to lose consciousness for approximately five seconds. When he gained consciousness, Bernal stopped resisting arrest."

The next day, Densmore sent an e-mail to a supervisor describing appellant's use of excessive force and acknowledging his own falsified report.[4] Sometime later, he identified the false statements in his report to David Weldon, a private investigator and former police officer hired by the City of Maywood to investigate the incident.[5]

Maywood Police Department Detective Sergeant Sean Richardson testified that he was shift supervisor on the evening of May 13, 2004. After learning that an arrestee required paramedics, he went to the sally port, where he found Bernal seated next to a wall, with blood on his face and head. When Bernal left in an ambulance, Richardson directed appellant to ride in the ambulance because Bernal had spit at the paramedics and refused medical treatment. Later that evening, Richardson interviewed appellant, who told him that Bernal had struck him with the car door and then attacked him, leading to a struggle. Appellant prepared and submitted his own use-of-force report, which Richardson approved and initialed. Richardson also approved and initialed the report on the incident submitted by Densmore.

Appellant's use-of-force report stated: "Upon our arrival at the station, I (Michael Singleton) opened the right rear door of the police unit. Bernal quickly jumped out of the vehicle and took an aggressive stance toward me. Bernal planted his feet firmly on the ground about shoulder width apart. Bernal began pulling away from me. Fearing Bernal was attempting to escape, I pulled Bernal toward me and held Bernal against the closest wall. As Officer Densmore and I attempted to escort Bernal to jail, he continued to be very resistant and violent. Bernal began to throw his body weight from side to side in a violent manner, pulling me off balance. Bernal continued to use his body weight to push me off the wall. Bernal began yelling, 'You are not going to take me to jail[,] fuckin' pigs.' Bernal then used his left foot to kick me on the left knee. I placed my right arm around Bernal's upper body to maintain control. During the struggle, Bernal lowered his head, opened his mouth, and attempted to bite my right forearm. Bernal then reared his head back and attempted to 'Head butt' me in the face. Due to the violent behavior of Bernal and his attempt to injure officers, I placed Bernal in a Dept. approved, academy trained, [sic] carotid restraint. Bernal continued thrashing his body from left to right yelling that he was not going to be arrested. Bernal lunged forward, lost his balance, and fell head first hitting the detectives['] door. Bernal appeared to lose consciousness for approx. 5 seconds. When he regained consciousness, Bernal stopped resisting."

---

[4] The parties stipulated that the e-mail was ultimately referred to the Maywood Police Department's chief of police.

[5] On cross-examination, Densmore stated that in 2000, he stole $350 from an employer. He also testified that two years later, he admitted the theft "on [his] own" and repaid the money.

The parties stipulated that at the time of the trial, neither appellant nor Densmore was employed by the Maywood Police Department.

### 4. Weldon's Testimony

David Weldon testified that he worked as a police officer from 1973 to 1987, when he retired from the Maywood Police Department. During this period, he acquired training and experience in controlling arrestees. Weldon viewed the video recording from the sally port camera and opined that appellant appeared to be in control of Bernal throughout the incident, insofar as it was captured in the video recording. He acknowledged that the video recording was "jerky" and resembled a series of snapshots, and that he could not analyze the events not visible on the video recording.

### B. Defense Evidence

### 1. Appellant's Testimony

Appellant testified as follows: he is five feet seven inches tall, and in May 2004 weighed a little over 200 pounds. He estimated that Bernal then weighed between 260 and 265 pounds. According to appellant, Bernal was hostile at the scene of the disturbance at Uribe's residence and during the drive to the police station. Appellant denied accelerating and braking the patrol car while Bernal was in it.

Appellant testified that he ordered Densmore to grab Bernal when they escorted him from the car to the station, but Densmore did not do so. Although appellant directed Bernal to remain in the car, Bernal stepped out and said that he would not go to jail. Appellant grabbed Bernal and pinned him against a nearby wall, then tried to move Bernal to the station door. He had trouble controlling Bernal, who resisted him. As they approached the door, Bernal attempted to "back-kick" appellant, who placed his right elbow on Bernal's neck to apply a control hold. Bernal then tried to bite appellant's arm and "headbutt" him. As a result, the pair lost their balance, and Bernal's head struck the wall. Appellant denied that he applied a control hold or punched Bernal while they were on the ground. He believed that the video recording did not depict the incident accurately because it omitted significant events.

After appellant and Densmore positioned Bernal against the wall, they tried to revive Bernal and called for medical assistance. When Bernal regained consciousness, he was hostile to police officers and medical personnel, and refused medical attention.

Appellant denied directing Densmore to justify appellant's use of force in Densmore's report. He also testified that he saw no version of Densmore's report describing appellant as having rammed Bernal's head into the station wall. Appellant acknowledged that he gave Densmore a written description of the incident, but denied that he "cut and pasted" portions of Densmore's final report into his own report. According to appellant, after Densmore completed his report, appellant wrote his own report and compared it to Densmore's report "as a reference," but "lifted" nothing from Densmore's report.

### 2. Defense Expert Testimony

Parris Ward, an expert on video analysis, testified that because the video recording was a series of images taken at intervals of 8/10ths of a second, it omitted events that occurred between "the snapshots."

Carley Ward, a biomechanical engineer, opined that appellant's testimony regarding the events preceding Bernal's injuries was consistent with the location and gravity of the injuries and the images on the video recording. She also opined that Densmore's testimony was inconsistent with the injuries and video recording.

## DISCUSSION

Appellant contends the trial court erred in (1) admitting Weldon's testimony, (2) limiting Carley Ward's testimony, and (3) limiting the cross-examination of Densmore. In addition, appellant contends (4) there was instructional error. For the reasons explained below, we discern no reversible error.

### A. Weldon's Testimony

Appellant challenges Weldon's testimony on several grounds. His principal contention is that the admission of Weldon's testimony contravened the principles established in *Kastigar*. In addition, he contends that Weldon's testimony was inadmissible under Evidence Code section 352 and constituted improper expert testimony.[6]

### 1. Kastigar

Appellant contends the admission of Weldon's testimony contravened his privilege against self-incrimination under the Fifth and Fourteenth

---

[6] All further statutory citations are to the Evidence Code.

Amendments to the United States Constitution. In 2004, the City of Maywood hired Weldon, then a private investigator, to inquire into appellant's conduct regarding Bernal. During the inquiry, Weldon required appellant to provide a statement regarding the incident in exchange for a grant of use and derivative use immunity, in accordance with *Garrity v. New Jersey* (1967) 385 U.S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616] (*Garrity*) and *Lybarger, supra,* 40 Cal.3d 822.[7] Following the investigation, Weldon concluded that appellant had used excessive force and had lied in his use-of-force report. He recommended that appellant be disciplined. At trial, the prosecution called Weldon to provide opinion testimony on a limited subject, namely, whether appellant had control over Bernal during the moments preceding his injuries captured in the sally port video recording. The trial court concluded that Weldon's testimony was admissible because it was grounded exclusively on the recorded images and Weldon's experience as a police officer, divorced from his investigation into appellant's misconduct.

Appellant contends that Weldon's trial testimony was inadmissible in view of his exposure to appellant's compelled statement. For the reasons explained below, we disagree.

### a.   *Governing Principles*

When, as here, a police officer is charged with offenses after giving a compelled statement during an administrative inquiry, the prosecution may not use the statement in any manner that contravenes the promise of immunity made to the officer. (*People v. Gwillim* (1990) 223 Cal.App.3d 1254, 1266, 1270–1273 [274 Cal.Rptr. 415] (*Gwillim*).) As explained in *Gwillim*: "In *Kastigar*[, *supra,*] 406 U.S. [at page] 453 . . . , the court held that the government can compel testimony from an unwilling witness who invokes the Fifth Amendment privilege against compulsory self-incrimination by conferring 'use and derivative use' immunity upon the witness. Such immunity bars use of the compelled testimony, or of evidence derived therefrom, in subsequent criminal proceedings." (*Gwillim, supra,* 223 Cal.App.3d at p. 1266.)

---

[7] In *Garrity, supra,* 385 U.S. 493, the United States Supreme Court stated that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." (*Id.* at p. 500.)

In *Lybarger, supra,* 40 Cal.3d 822, our Supreme Court held that during an administrative investigation into potential misconduct by a police officer, the officer must be told that "although he had the right to remain silent and not incriminate himself, (1) his silence could be deemed insubordination, leading to administrative discipline, and (2) any statement made under the compulsion of the threat of such discipline could not be used against him in any subsequent criminal proceeding. [Citations.]" (*Id.* at p. 829.)

In so holding, the United States Supreme Court recognized that a criminal defendant attempting to discover violations of the immunity agreement should not be "dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities." (*Kastigar, supra*, 406 U.S. at pp. 459–460.) To resolve this problem, the high court devised what the Ninth Circuit has characterized as a "sensible, and highly practical, solution," namely, a rule that "put the burden of showing non-use on the government." (*U.S. v. Danielson* (9th Cir. 2003) 325 F.3d 1054, 1071 (*Danielson*).) On this matter, the high court held that once the defendant establishes that he has testified under a grant of immunity, the prosecuting authorities " 'have the burden of showing that their evidence is not tainted.' " (*Kastigar, supra*, 406 U.S. at p. 460, quoting *Murphy v. Waterfront Comm'n* (1964) 378 U.S. 52, 79, fn. 18 [12 L.Ed.2d 678, 84 S.Ct. 1594].) The high court explained that this burden of proof—which it described as "heavy"—requires a showing that all of "the evidence [the prosecution] proposes to use is derived from a legitimate source wholly independent of the compelled testimony." (*Kastigar*, at pp. 460–462.)

■ The term "heavy" primarily concerns the scope of the requisite showing, rather than the applicable evidentiary standard, as "the prosecutor need show only by a preponderance of the evidence that the evidence adduced against defendant is derived from legitimate independent sources." (*Gwillim, supra*, 223 Cal.App.3d at p. 1266; see *U.S. v. Montoya* (9th Cir. 1995) 45 F.3d 1286, 1292, fn. 6.) Generally, *Kastigar* proscribes " 'any use, direct or indirect,' of the immunized statement," provided that the use is "actual," rather than merely "potential." (*Gwillim, supra*, 223 Cal.App.3d at p. 1271.) Thus, "[n]egation of all abstract possibility of taint is not necessary." (*U.S. v. Schmidgall* (11th Cir. 1994) 25 F.3d 1523, 1529 (*Schmidgall*).)

Under *Kastigar*, the prosecution must make an affirmative showing that the evidence in question is, in fact, derived from sources independent of the compelled statement; the prosecution cannot carry its burden simply by asserting the existence of an independent source. (*Danielson, supra*, 325 F.3d at p. 1071; *Schmidgall, supra*, 25 F.3d at p. 1528.) As "[t]he particular proof that will satisfy the government's 'heavy burden . . .' [citation] will vary from case to case . . . ," the adequacy of the prosecution's showing must be assessed in light of the circumstances surrounding the proffered evidence. (*Danielson, supra*, 325 F.3d at p. 1072.) Provided that the trial court has applied correct legal principles, we review a finding that the prosecution has carried its burden for the existence of substantial evidence. (See *U.S. v. Koon* (9th Cir. 1994) 34 F.3d 1416, 1433, revd. in part on another ground *sub nom. Koon v. United States* (1996) 518 U.S. 81, 100 [135 L.Ed.2d 392, 116 S.Ct. 2035] [findings reviewed for clear error]; *U.S. v. Gallo* (2d Cir. 1988) 859 F.2d 1078, 1091 [same]; *People v. Jackson* (1992) 10 Cal.App.4th 13, 22 [12

Cal.Rptr.2d 541] ["[T]here is no practical difference between the federal 'clearly erroneous' test and a substantial evidence standard of review."].)

The focus of our inquiry is on Weldon's trial testimony, as there is no suggestion that the prosecution itself had any contact with appellant's compelled statement or knew its contents. Under *Kastigar*, Weldon's acquaintance with the compelled statement, by itself, does not erect an insuperable barrier to his testimony. As the court explained in *Gwillim*, "a witness's exposure to immunized testimony does not constitute 'an incurable disease . . . . [T]he defendant[s'] Fifth Amendment rights are not infringed if a witness hears immunized testimony and yet testifies solely to facts personally known to the witness.' " (*Gwillim, supra*, 223 Cal.App.3d at p. 1272.) Similarly, the Ninth Circuit stated in *Koon*: "Ensuring that the content of a witness's testimony is based on personal knowledge . . . meets the *Kastigar* requirement that the defendant's compelled statements shall not be used against him in subsequent criminal proceedings." (*U.S. v. Koon, supra*, 34 F.3d at pp. 1432–1433.)

*Gwillim* and *Koon* provide instructive applications of this principle. In *Gwillim*, a police officer reported her supervising sergeant had sexually assaulted her, which triggered an administrative investigation into the sergeant's behavior. (*Gwillim, supra*, 223 Cal.App.3d 1254.) During the investigation, the officer provided a recorded statement about her version of the events, and later learned information about the sergeant's compelled statement. (*Id.* at p. 1260.) After the sergeant was charged with criminal sexual battery and sexual assault, the trial court dismissed the action, concluding, inter alia, that the officer's exposure to the sergeant's compelled statement irredeemably tainted the prosecution case. (*Id.* at pp. 1263–1264.) The appellate court rejected this conclusion, reasoning the officer's recorded statement provided an adequate basis for establishing that her trial testimony relied exclusively on her percipient knowledge of the underlying events. (*Id.* at pp. 1272–1273.)

In *Koon*, two of the officers charged with offenses arising from the well-known Rodney King incident made compelled statements prior to their first trial in state court. (*U.S. v. Koon, supra*, 34 F.3d at p. 1431.) During their second trial in federal court, they objected to the admission of a codefendant's state trial testimony, contending that he had been exposed to their compelled statements before he testified. (*Ibid.*) Following a *Kastigar* hearing, the federal district court found that the testimony was not tainted by exposure to the compelled statements. (*U.S. v. Koon, supra*, at p. 1433.) In affirming, the Ninth Circuit concluded that the record reflected legitimate independent sources for the testimony, as it disclosed that the codefendant had been a percipient witness to the events to which he testified, and that other information he provided was traceable to sources other than the compelled statements. (*Ibid.*)

Here, Weldon was not a percipient witness to the underlying events, and was presented to offer opinions regarding the events depicted in the video recording. Under *Kastigar*, the prosecution may present opinion testimony from an expert exposed to a compelled statement only when it "can prove that this testimony is derived from a source wholly independent from [the statement]." (*In re Commitment of Harrell* (2008) 2008 WI App 37 [308 Wis.2d 166, 182, 747 N.W.2d 770, 778–779].) We therefore examine whether the prosecution carried this burden.

b. Kastigar *Hearing and Testimony*

In response to appellant's objection to Weldon's testimony under *Kastigar*, the trial court conducted a hearing into his proposed testimony and its sources. At the hearing, Weldon described his employment as a police officer from 1973 to 1983 and subsequent employment as a private investigator, including his inquiry into Bernal's injuries for the City of Maywood. According to Weldon, he acquired considerable experience dealing with violent arrestees while working as a police officer; he had served as a training officer and was familiar with techniques used to control combative arrestees.

Weldon further testified that after completing his investigation into Bernal's injuries, he submitted a report of his conclusions to the City of Maywood. According to Weldon, his determination that appellant had used excessive force and had lied in his own use-of-force report was based on "the totality of [his] investigation," including appellant's compelled statement and the sally port video recording. Regarding his proposed testimony at trial, Weldon stated that the prosecutor had asked him to view the video recording, interpret it solely on the basis of his experience "separated from the Singleton affair," and opine whether, on the frames depicted in the video recording, appellant was in control of Bernal. Weldon testified that he had complied with these restrictions, and concluded, based on his experience and training, that the video recording showed appellant to be in control of Bernal during the moments preceding the alleged assault.

When appellant's counsel asked, "And you can separate in your mind and divorce from your thinking while testifying—you can completely . . . etch-a-sketch all that you learned during the investigation—the interview of [appellant] and the conclusions that you came to?" Weldon responded that he could. He further testified that he had not reviewed his report in preparation for his testimony, but acknowledged that he remembered its conclusions. He asserted that he could be objective in formulating his opinion and "not rely on previous information." In ruling that Weldon's testimony was admissible, the trial court stated: "I believe that the jury has a right to hear from him. I

believe that he's . . . being asked to do nothing more than the average judge . . . or even jurors are asked to do[, namely] to set aside previous information . . . ."

During Weldon's trial testimony the jury was shown the video recording, which amounts to a series of still images. It captures the moments preceding the alleged assault: it shows the police car arriving at the station; appellant and Densmore leaving the car; appellant escorting Bernal from the car; appellant pressing Bernal against a nearby wall; and appellant moving Bernal along the wall and turning a corner, where they disappear from view. The video recording does not capture the moment when Bernal was injured.

While playing the video recording, the prosecutor asked Weldon to describe what he observed after Bernal left the police car. Weldon testified that Bernal appeared to walk toward the wall himself, and did not appear to be violent or combative. When asked, "Did it appear to you that Officer Singleton had control of this suspect in the manner that he moved him?" Weldon responded, "Yes." When shown subsequent frames, Weldon testified that appellant appeared to be raising Bernal's handcuffed hands behind his back—a technique used by officers to allow them to gain control of an arrestee.

The prosecutor next questioned Weldon about the images showing appellant and Bernal moving along the wall before they disappeared around the corner. Weldon responded that appellant appeared to walk in front of Bernal, and that Bernal seemed to stumble over a barricade. Weldon also stated that appellant appeared to put his left forearm in Bernal's back as he pushed Bernal over a cigarette ashtray at the building's corner. At the end of the direct examination, Weldon opined that appellant appeared to be in control of Bernal throughout the moments depicted in the video recording.

During cross-examination, Weldon stated that his opinions were based on what he observed on the video recording. When defense counsel asked Weldon to assume that Bernal had been aggressive and combative, and had jumped out of the police car and adopted a hostile posture, Weldon opined that it could have been a proper police tactic for appellant to pin Bernal against the wall. On further questioning, Weldon reaffirmed his opinion that in the video recording, Bernal appeared to walk to the wall himself, and appellant appeared to have physical control of him. Weldon also opined that if Bernal had been aggressive, Densmore should have assisted appellant.[8]

---

[8] During the brief redirect examination, Weldon reaffirmed his testimony on direct examination.

c. *Analysis*

■ We conclude that Weldon's testimony was admissible under *Kastigar*, as the record reflects that Weldon relied on sources independent of appellant's compelled statement. Although Weldon was an opinion witness, not a percipient one, his testimony was narrowly confined to assessing appellant's control over Bernal on the basis of the video images and Weldon's experience as a police officer. As the images and Weldon's experience are independent of the compelled statement, they satisfy the requirements enunciated in *Kastigar* and its progeny. We have carefully reviewed the video recording and Weldon's testimony addressing it, and we discern nothing in the testimony that is not traceable to these independent sources.

Appellant contends the prosecution failed to carry its burden under *Kastigar* because it offered only an assertion of Weldon's "integrity and good faith" to show that he made no use of the compelled statement (*Kastigar, supra*, 406 U.S. at pp. 459–460). We disagree. As explained above (see pt. A.1.a., *ante*), the manner in which the prosecution may carry its burden varies from case to case, depending on the evidence at issue.

Here, the independence of Weldon's testimony from the compelled statement was subject to confirmation beyond his assertion of "integrity and good faith" (*Kastigar, supra*, 406 U.S. at pp. 459–460). Although Weldon was not a percipient witness, he was directed to ground his opinions on what he *saw* on the video recording. The independence of Weldon's testimony, insofar as he described the images, is supported by the fact that he looked at the video recording. (See *U.S. v. Koon, supra*, 34 F.3d at p. 1433.) Moreover, Weldon was required to rely on his experience and knowledge of techniques for controlling arrestees, which he acquired before he was exposed to appellant's compelled statement. A careful examination of his testimony establishes its independence, as every aspect of the testimony was closely tethered to the video images and specific control techniques he had learned as an arresting officer. (See *ibid.*)

Appellant's reliance on several cases is misplaced. In each case, the prosecutor attempted to carry its burden regarding witness testimony by presenting a conclusory showing of independence. (*State v. Gault* (Minn.Ct.App. 1996) 551 N.W.2d 719, 723 [trial court properly barred testimony from 12 witnesses potentially exposed to compelled statement when prosecution provided no evidence regarding sources of their testimony]; *U.S. v. North* (D.C. Cir. 1990) 285 U.S. App.D.C. 343 [910 F.2d 843, 861–868] [trial court improperly admitted testimony from witnesses who were warned not to rely on compelled statement without assessing independence of sources]; *U.S. v. Hampton* (11th Cir. 1985) 775 F.2d 1479, 1487–1488

[prosecution's conclusory denials that immunized statement was source of evidence presented to grand jury were inadequate to carry prosecution's burden].) As explained above, that is not the situation here. In sum, we find no *Kastigar* error.[9]

### 2. *Section 352*

Appellant contends the trial court erred in refusing to exclude Weldon's testimony under section 352. The crux of his argument is that the testimony was excessively prejudicial, as appellant could not cross-examine Weldon about his potential bias—namely, Weldon's conclusions as Maywood's investigator—without disclosing the investigation and compelled statement. For the reasons explained below, we reject the contention.

■ "Under . . . section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 [36 Cal.Rptr.2d 235, 885 P.2d 1], italics omitted.)

■ Generally, the confrontation clause of the Sixth Amendment to the United States Constitution entitles a defendant to engage in " 'otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness . . . .' " (*People v. Smith* (2007) 40 Cal.4th 483, 513 [54 Cal.Rptr.3d 245, 150 P.3d 1224], quoting *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [89 L.Ed.2d 674, 106 S.Ct. 1431].) Nonetheless, not every restriction on a defendant's cross-examination rises to a constitutional violation. (*People v. Ayala* (2000) 23 Cal.4th 225, 301 [96 Cal.Rptr.2d 682, 1 P.3d 3].) "The trial court . . . has a 'wide latitude' of discretion to restrict cross-examination and may impose reasonable limits on the introduction of such evidence. [Citation.] Thus, 'unless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility" [citation], the trial court's exercise

---

[9] While on the facts of this case we find no error under *Kastigar*, we are troubled by the prosecutor's decision to create the potential for such error by electing to call the witness who had taken appellant's compelled statement. A passing familiarity with *Kastigar* and its progeny would counsel against calling a witness exposed to a compelled statement unless the witness was in possession of unique and crucial testimony. Given the relatively generic nature of Weldon's testimony, the prosecutor could and should have secured another witness to opine on the events depicted in the video recording.

of its discretion in this regard does not violate the Sixth Amendment.' [Citation.]" (*People v. Smith, supra*, 40 Cal.4th at p. 513.)

Prior to the commencement of trial, defense counsel sought to exclude Weldon's testimony, contending that it would be excessively prejudicial to appellant because effective cross-examination of Weldon would inevitably disclose appellant's compelled statement. Defense counsel argued: "[The prosecutor is] calling a use-of-force expert, and I can't cross-examine him because of the *Garrity* issue. . . . That violates [appellant's] rights." Defense counsel also suggested that the prosecutor had called Weldon because effective cross-examination of Weldon would be problematic. The court deferred ruling on appellant's request to exclude Weldon's testimony pending a *Kastigar* hearing, but made clear that if permitted to testify, Weldon would be instructed not to refer to appellant's compelled statement, and that defense counsel would be free to cross-examine Weldon for bias.

Following the *Kastigar* hearing, the court indicated its inclination to limit Weldon's direct testimony to his observations of the video recording, avoiding any discussion of the results of the investigation: "I'm willing to limit it to[:] . . . 'This is who [I am]. This is what [I've] done. [I've] looked at this video. This is what [I] think' and not allow the people to go into that he . . . made any type of recommendations to Maywood Police or anything like that." Defense counsel argued that in order to challenge Weldon's credibility on cross-examination, he would be compelled to "launch off into the investigation . . . and thereby potentially invite error in terms of *Kastigar*." The court noted that defense counsel had already elicited testimony that Weldon had been hired to investigate appellant's conduct and that the investigation had resulted in a final report. The court advised defense counsel that it would limit the prosecution's direct examination of Weldon, but left open the scope of defense counsel's cross-examination. Defense counsel made no inquiry regarding the investigation or its outcome.

We see no error in the trial court's rulings. Before the trial court, appellant argued that effective cross-examination of Weldon would necessitate an inquiry into Weldon's investigation and the existence and contents of appellant's compelled statement. However, eliciting Weldon's potential bias due to his investigation required *no* disclosure regarding the compelled statement. By the time Weldon testified, the jury knew that Weldon had conducted an administrative investigation that had resulted in a final report. The only additional fact required to suggest a " 'prototypical form of bias' " (*People v. Smith, supra*, 40 Cal.4th at p. 513) on Weldon's part was that he had reached conclusions unfavorable to appellant during the investigation. No further disclosure about the existence of appellant's compelled statement and its contents was necessary. As the trial court was prepared to allow defense

counsel to elicit the requisite additional fact needed to demonstrate potential bias, the trial court did not deny appellant an opportunity for effective cross-examination or burden his rights under *Garrity* and *Kastigar*.

On appeal, appellant contends the admission of Weldon's testimony impermissibly burdened his rights to privacy regarding Weldon's investigation under article I, section 1 of the California Constitution and Penal Code section 832.7, subdivision (a).[10] He argues that he could establish that Weldon had reached unfavorable conclusions about his conduct only by giving up his privacy interests regarding Weldon's investigation.

■ Appellant has forfeited this contention. " 'It is, of course, "the general rule" . . . "that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." ' " (*People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365], quoting *People v. Benson* (1990) 52 Cal.3d 754, 786, fn. 7 [276 Cal.Rptr. 827, 802 P.2d 330] [defendant forfeited evidentiary objection based on confrontation clause].) As appellant raised no specific objection predicated on his privacy rights before the trial court, he has not preserved his contention for appeal. (See *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1504–1505 [66 Cal.Rptr.3d 833] [party forfeited evidentiary objection based on federal constitutional privacy rights by failing to raise it before trial court].)

### 3. *Expert Testimony*

■ Appellant contends that Weldon's opinions were inadmissible as expert testimony.[11] We disagree. "Opinion testimony may be admitted in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience. Thus, expert opinion is admissible if it is '[r]elated to a subject that is sufficiently beyond common experience [and] would assist the trier of fact.' (Evid. Code, § 801, subd. (a).) Expert opinion is not admissible if it consists of inferences and conclusions which can be

---

[10] Subdivision (a) of Penal Code section 832.7 provides: "Peace officer or custodial officer personnel records and records maintained by any state or local agency pursuant to [Penal Code s]ection 832.5, or information obtained from these records, are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code. This section shall not apply to investigations or proceedings concerning the conduct of peace officers or custodial officers, or an agency or department that employs those officers, conducted by a grand jury, a district attorney's office, or the Attorney General's office."

[11] Respondent contends that this contention has been forfeited. However, the record discloses that in admitting Weldon's testimony, the trial court understood that appellant disputed whether Weldon would present proper expert opinion.

drawn as easily and intelligently by the trier of fact as by the witness. [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 45 [39 Cal.Rptr.2d 103], quoting § 801, subd. (a).) Whether an expert should be permitted to opine on a particular subject is consigned to the trial court's discretion. (*People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001 [79 Cal.Rptr.3d 634].)

Appellant argues that because Weldon purported to ground his testimony on the video recording, his testimony was not beyond the common experience of the jurors. However, as explained above (see pt. A.1.b., *ante*), Weldon did not merely describe the video recording images, but interpreted them as an experienced police officer: he explained control techniques he saw appellant use and opined whether appellant appeared to have control of Bernal. We therefore reject appellant's contention.

Appellant also suggests that Weldon was not qualified to testify as an expert, as Weldon had resigned as a police officer in 1987 and had no expertise in video analysis. Again, we disagree. "The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown. [Citation.] This court may find error only if the witness ' "*clearly lacks* qualification as an expert." ' [Citation.] Whether a person qualifies as an expert in a particular case depends on the facts of that case and the witness's qualifications. In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited. [Citation.]" (*People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 36–37 [117 Cal.Rptr.2d 738], quoting *People v. Hogan* (1982) 31 Cal.3d 815, 852 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].)

Although Weldon did not claim to be a use-of-force expert, he testified that he had considerable experience with violent arrestees, was familiar with techniques for controlling arrestees, and had served as a field training officer. Because Weldon's testimony was limited to appellant's control over Bernal during the brief interval depicted in the video recording, the trial court did not err in determining that he was qualified to offer expert opinion on the subject.

B.–D.4.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1.

## DISPOSITION

The judgment is affirmed.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied March 10, 2010, and on February 22, 2010, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 17, 2010, S181432.