Filed 8/22/24  P. v. Castellanos CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　　　v.<br><br>ANDREW JAMES CASTELLANOS,<br><br>　　Defendant and Appellant. | G062756<br><br>(Super. Ct. No. FVI22001567)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Shannon L. Faherty, Judge. Reversed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanaski, Donald W. Ostertag and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

\*　　　　　\*　　　　　\*

Leora A. (Leora) was driving out of her apartment complex when four shots were fired at her car. Leora's front seat passenger Briana Torres was shot in the head and killed. About a week later, the police arrested Torres's "on and off" boyfriend Andrew James Castellanos. A jury found Castellanos guilty of second degree murder, unlawful possession of a firearm by a felon, and found true a personal use of a firearm enhancement.

Castellanos claims the trial court erred by admitting evidence of his prior convictions to prove his status as a felon. We disagree. Castellanos would not stipulate that he was a felon, and he did not object at trial on the same grounds he raises on appeal.

Castellano also claims the court erred by allowing an officer to opine as to his credibility. We disagree. The officer merely summarized conflicting statements made by Castellanos during a lengthy interview, and Castellanos did not object at trial on the same grounds he raises on appeal.

Castellanos also claims the trial court erred by instructing the jury that it could consider his uncharged offenses to prove his identity. (See CALCRIM No. 375.) We agree. The jury instruction was plainly erroneous because the People did not introduce any evidence under Evidence Code section 1101, subdivision (b).[1] Based on the incorrect instruction, one or more jurors may have improperly considered Castellanos's prior convictions when determining whether or not he was the shooter, which was essentially the only disputed issue during the trial. Thus, we find the trial court's instructional error was prejudicial and we reverse the judgment.

---

[1] Further undesignated statutory references are to the Evidence Code; we shall also omit the use of the word "subdivision" or its abbreviation when referring to the Evidence Code.

2

# I.

## FACTS AND PROCEDURAL BACKGROUND

In May 2022, Leora lived in Apple Valley, down the street from Castellanos, who was also known as "Green Eyes." Leora testified Castellanos regularly carried a gun. Leora had known Castellanos for about six months and would speak to him several times a week by phone.[2] Castellanos had introduced Torres to Leora about five months earlier. Leora said Torres and Castellanos had an "on and off" romantic relationship, which involved verbal and physical arguments about 80 percent of the time.

Sometime prior to her death, Torres told Leora: "That Green Eyes was out to get her." At trial, Leora testified that she saw four incidents of domestic violence committed by Castellanos against Torres. About five months before the shooting, Castellanos grabbed his gun, went to the backseat of Leora's car where Torres was sitting, and grabbed her by the arm. Two to three months before the shooting, Torres went to Leora's apartment appearing scared and distraught; Castellanos later showed up with his gun in his hand looking for Torres. One to two months before the shooting, Torres and Castellano were arguing in Leora's kitchen when Castellano cornered Torres by the fridge and threatened to shoot her and then himself in the head. About a month prior to the shooting, Torres and Castellanos were arguing outside of Leora's apartment; Castellanos grabbed Torres by the hair, dragged her to the ground and kicked her.

On May 26, 2022, at about 8:45 p.m., Leora was away from her apartment picking up a prescription. At Leora's home were her 7-year-old

---

[2] When asked at trial if Leora had a "friendship" with Castellanos, she described it as, "An acquaintanceship, yeah." (RT 1094)

son, her female friend who was babysitting her son, and a male friend known as Dog. The babysitter heard a knock at the door. She opened the door and Torres "forced her way in." Torres was in a hurry to come inside; she appeared timid and scared. Torres repeatedly said, "He's going to beat me. He's gonna hurt me." Torres said she was referring to Green Eyes.

The babysitter took Torres into Leora's bedroom. She tried to calm Torres down and "let her know she was going to be okay, she was safe, that Dog was going to make sure of it; that she was safe there with us." The babysitter heard a knock and asked Dog to answer the front door. When Torres heard the knock, "She was really scared. She didn't know what to do. She was nervous." The babysitter could not hear or see what was happening at the front door.

Leora was driving home when she received a call from Castellanos, who told her, "To tell [Dog] to stay out of it and let [Torres] come outside." Castellanos said that if Dog did not stay out of it, then Castellanos "was going to shoot him." Leora told Castellanos that she would "try to call them but just to sit tight because I was on my way home." After Leora hung up the phone, she received a call from the babysitter. Leora told the babysitter she knew what was going on and that she was on her way home.

When Leora arrived home a few minutes later, she parked her car in her designated  parking spot. Leora said she "checked the surrounding area and she didn't see Green Eyes anywhere." Leora said that "she wanted to get [Torres] out and make sure that she was somewhere safe." After Leora entered her apartment, she told Torres, "I didn't see him anywhere outside and that it's probably a good idea for us to leave as soon as we could before he came back."

Leora walked out to her car with Torres and Dog. Leora said she

"noticed somebody walk past and I thought it was Castellanos but it wasn't so we quickly got into the car." Leora got in the driver's seat and Torres got in the passenger seat. Dog stood nearby as Leora backed up and "pulled out onto the street. We started driving past my mailboxes."

Leora then "heard a gunshot and I felt glass hit my arm." Leora looked over and saw that Torres was slumped over in her seat. Leora said that Torres "was not moving. And I looked over and saw, like, a hole in the glass where her head was."

Leora took Torres to a nearby emergency room. After Leora arrived at the hospital, she received a call from the babysitter. Leora later testified, "I believe that I said Green Eyes shot her." The babysitter later testified that "Leora said 'he' shot" Torres, but did not mention the name "Green Eyes."

A few days later, Torres died from a gunshot wound to her head. Torres had amphetamine in her blood. A medical examiner opined that this could be attributable to a therapeutic drug given in the hospital, or the results could be due to methamphetamine.

*Police Investigation*

Outside of the emergency room, police interviewed Leora, who appeared distraught and panicked. Leora's car had two bullet holes and two bullet marks on the passenger side. Leora told the police Torres had requested a ride to an unknown location, and someone was after Torres, but she did not mention Castellanos. Leora later admitted to the officer that she had deleted two phone calls between her and Castellanos before speaking to the police. Leora said Torres had recently let someone overdose in front of her and there were people out to get her because of that incident.

On the night of the shooting, the police searched the area and found five spent cartridge casings next to a group of trash cans. The casings were not in the same precise location where the shots were fired, and they were not linked to Castellanos.

Police later obtained surveillance video from a home across the street from Leora's apartment complex. The complex was located in a high crime area known as "Felony Flats." On the night of the shooting, the video showed Leora's car pulling into her parking spot and her getting out and walking to her apartment. A few minutes later, Leora is seen walking back out to her car with Torres and Dog. Leora and Torres are seen getting into the car, and a person is seen walking past the back of the car, right before Leora pulled out of the driveway. The video then appears to show this person walking away from the area where the shooting took place.

The police determined the shooting took place at about 9:23 p.m. The police obtained cell phone records from Castellanos's cell phone. At 9:15 p.m., the phone had been near the area of the shooting and near his home, about 200 to 300 feet away. The cell phone data could not establish with accuracy which location. At 10:48 p.m., Castellanos's phone pinged several miles away.

Facebook records indicated Torres had conversations with Castellanos, and other individuals in the weeks leading up to the shooting. About three weeks before the shooting, Torres said to Castellanos, "'I have two big ugly bumps on my head.'" Torres said, "'You're so mean. I can't believe you did what you did to me yesterday.'" Castellanos responded, "Sorry." There was another message dated the same day that said, "'Yesterday Green Eyes hit me hard with the gun in my head.'" There were other messages not necessarily tied to Castellanos: "'He pistol whipped me

yesterday.'" "'And f**ked me up.'" "'He's keeping me hostage.'" "'He's going to kill me by the end of the day.'" "'Yesterday I told him I don't wanna be with him and he started kicking me.'" He "'suffocated me and said that he's going to torture and kill me.'"

About a week after the shooting, the police arrested Castellanos and took him out of his house without incident. Police did not locate a firearm or ammunition on his person.

Police conducted an interview that lasted about three-and-a-half hours. Toward the end of the interview, Castellanos said that on the night of the shooting, he might have "walked across the street" to a neighbor's house. Castellanos said he went there because Torres knew the people who lived there. He said he knocked on the door, and a "[B]lack dude answer[ed.]" He said the man slammed the door in his face. Castellanos said that was "about as far as it went," and he went back home. He denied killing Torres (the interview will be covered in greater detail in the discussion section of this opinion).

*Court Proceedings*

The People charged Castellanos with first degree murder and unlawful possession of a firearm by a felon. The information further alleged Castellanos used a firearm in the commission of the murder.

On the first day of the trial, the People filed a trial brief, which included several motions in limine. The People sought to introduce evidence of prior acts of domestic violence under section 1109 through Leora's testimony; the People did not seek to introduce any evidence under section 1101 (b). The court began a pretrial hearing (the proceedings will be covered in detail in the discussion section of this opinion). On the second day, the

7

court concluded the pretrial hearing and empaneled a jury.

On the third day, the People began their case-in chief. Leora and the babysitter testified; Dog did not testify. Leora had prior felony convictions for theft and an assault with great bodily injury. On the fifth day, the People rested; the defense put on no case. On the sixth day, the court finalized jury instructions (these proceedings will be covered in detail in the discussion section of this opinion). After closing arguments, the jury began its deliberations.

On the seventh day, the jury requested a readback of Leora's testimony. On the eighth day, the jury requested a readback of the babysitter's testimony. The request stated: "(Phone call to clarify between 'Greeneyes shot her' vs. 'He shot her.')"

On the ninth day, the jury found Castellanos not guilty of first degree murder, guilty of second degree murder, and guilty of being a felon in possession of a firearm. The jury found true the firearm allegation.


II.

DISCUSSION

Castellanos's claims the trial court erred: A) by admitting evidence of his prior convictions to prove his status as a felon; B) by allowing an officer to state his opinion about Castellanos's credibility; and C) by not properly instructing the jury about the use of his prior convictions. We shall analyze each of these claims.[3]

---

[3] Castellano also claims there was cumulative prejudice, and the trial court abused its discretion at the time of sentencing. But we need not reach these claims because of our finding of a prejudicial instructional error.

8

*A. Alleged Improper Admission of Castellanos's Prior Convictions*

Castellanos claims the trial court erred by "admitting evidence of his remote, prior gun possession convictions." (Capitalization & boldface omitted.) We disagree.

A challenge to the admission of evidence is reviewed for an abuse of discretion: "The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

In this part of the discussion, we shall: 1) state the principles of law regarding the proof of a defendant's status as a felon; 2) summarize the trial court proceedings; and 3) analyze the law as applied to the facts.

*1. Principles of Law*

"Any person who has been convicted of a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." (Pen. Code, § 29800, subd. (a)(1).)

A "trial court [has] only two options when a prior conviction is a substantive element of a current charge: Either the prosecution proves each element of the offense to the jury, or the defendant stipulates to the conviction and the court 'sanitizes' the prior by telling the jury that the defendant has a prior felony conviction, without specifying the nature of the felony committed." (*People v. Sapp* (2003) 31 Cal.4th 240, 262.)

In order to raise an alleged error on appeal, the issue must first be raised in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 & fn. 2.) A verdict will not be reversed based on the erroneous admission of evidence unless there was an objection "that was timely made and so stated as to make

clear the specific ground of the objection." (§ 353.) "The requirement of a specific objection under section 353 applies to claims seeking exclusion under section 352." (*People v. Holford* (2012) 203 Cal.App.4th 155, 169.)

"What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. . . . A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

### 2. Trial Court Proceedings

In its pretrial brief, the People sought to introduce 14 prior felony convictions for the purpose of proving count two (firearm possession by a felon). The 14 crimes were: theft charges (5); possession of a firearm by a felon (3); receiving a stolen vehicle (2); possession of ammunition by a felon; petty theft with prior convictions; possession of a controlled substance (methamphetamine); and reckless evading.

The brief stated: "The People intend to prove Defendant's felony convictions by means of a certified RAP sheet and certified prior packets. [¶] In the alternative, the People welcome a stipulation to the defendant's prior convictions." The People also sought to admit a total of 22 moral turpitude convictions (misdemeanors and felonies) for the purposes of impeachment should Castellanos take the stand during the trial and testify.

On the first day of the pretrial hearing, the court addressed the proffered moral turpitude convictions being offered for the purposes of impeachment. Castellanos's counsel objected to the three unlawful possession

of a weapon crimes from 2003, 2006, and 2007 "being that they're so long ago that I would ask to remove, but I would submit on the rest." The court struck the petty theft with prior thefts crime (former Pen. Code, § 666, as amended by Stats. 2009 ch. 135, § 134), because it is no longer a crime, and admitted the rest.

The following day, the court said, "We have not yet discussed the prior felony convictions for Count 2, possession of a firearm by a felon. [¶] [Counsel], did you and your client intend to stipulate to his status as a felon?" Counsel responded, "No, we're not stipulating."

Counsel objected to the petty theft with priors conviction (former Pen. Code, § 666) and the possession of a controlled substance conviction (Health & Saf. Code, § 11377) being offered to prove Castellanos' status as a felon. (RT 998-999) Defense counsel said, "There's more than sufficient other charges or convictions on that count to be able to prove up that charge." The prosecutor said the People "are asking that the 666 remain. However, the People will concede on the 11377." The court ruled "the 666 would be eligible to be used as a prior for [count two], but I will accept that the People are not going to use the 11377."

During the trial, the People introduced six of Castellanos's prior felony convictions through testimony explaining certified documents identifying Castellanos as the defendant: possession of a firearm by a felon in 2003; receiving a stolen vehicle in 2006; possession of a firearm by a felon in 2007; taking a motor vehicle in 2010; and two theft convictions in 2012. During the testimony, the court overruled objections based on grounds of lack of foundation and hearsay.

11

### 3. Application and Analysis

A trial court does not commit error by admitting more than one prior conviction to prove a defendant's status as felon. (*People v. Stewart* (2004) 33 Cal.4th 425, 477–478 (*Stewart*).) In *Stewart*, a jury found the defendant guilty of three counts of capital murder, possession of a firearm by a felon (count four), and attempted arson (count five). (*Id.* at p. 431.) On direct appeal, one of defendant's claims was the trial court erred "by failing to confine the evidence of defendant's prior felony statutes to only one of the prior felonies listed in count 4." (*Id.* at p. 477.) The Court disagreed. (*Id.* at p. 478.) The Court noted that if a defendant stipulates to his status as a felon, the stipulation must be accepted by the trial court because the evidence is generally considered more prejudicial than probative. (*Id.* at pp. 478-479.)

"Here, however, defense counsel *refused* to stipulate generally to his client's felon status . . . ." (*Stewart*, *supra*, 33 Cal.4th at p. 478.) The defendant's prior felony convictions were for "attempted robbery, automobile theft, receiving stolen property, forgery, and possession of a firearm by a felon." (*Id.* at p. 476.) The defense counsel at trial said he did not want to leave the jury with the impression that the defendant may have been convicted of an "'[e]gregious felony or an unspecified felony 'without explanation.'" (*Id.* at p. 477.) The Supreme Court concluded: "On this record, we do not perceive any error on the part of the trial court." (*Id.* at p. 378.)

In this case, as to the unlawful possession of a firearm by a felon charge (count two), the People were required to prove Castellanos's status as a felon. (See Pen. Code, § 29800, subd. (a)(1).) Castellanos would not stipulate to this fact, so the trial court properly admitted into evidence the proffered prior felony convictions. (See *Stewart*, *supra*, 33 Cal.4th at p. 478.) Thus, we find the trial court committed no evidentiary error in this regard.

12

Castellanos argues: (1) that only one prior conviction was necessary to prove his status as a felon, (2) the court should have excluded the prior convictions for being a felon in possession of a firearm, and (3) the trial court erred by not conducting an analysis of whether the proffered evidence was more probative than prejudicial.

But Castellanos did not object to the admission of his prior convictions on these grounds at trial, including section 352 grounds, so these arguments are forfeited on appeal. (See *People v. Robinson* (2024) 99 Cal.App.5th 1345, 1356–1357 [the forfeiture rule has particular importance in a criminal trial]; see also *People v. Booker* (2011) 51 Cal.4th 141, 170 [the failure to object on section 352 grounds forfeits that issue on appeal].)

Castellanos contends in his opening brief that his trial "counsel objected to the court admitting the two priors on the grounds they were remote, implicating section 352." But that is not entirely accurate.

On the page of the reporter's transcript cited by Castellanos to support this point, there is no objection by counsel. On the following page, counsel stated: "I would just object to the 2003, 2006, and 2007 [possession of a weapon by a felon convictions] being that they're so long ago that I would ask to remove, but I would submit on the rest."

However, this objection was made on the first day of the pretrial hearing, when the court was discussing the admission of moral turpitude convictions for impeachment purposes should Castellanos testify. The next day, when there was a discussion of what is at issue here—the admission of prior convictions to prove the possession of a firearm by a felon charge—there were no objections by trial counsel to the admission of this evidence on any of the grounds Castellanos now raises on appeal, so they have been forfeited.

Castellanos also argues in his reply brief that "there is nothing

in the record to show the prosecutor even offered to stipulate to" his status as a felon. But again, that statement is inaccurate. In the pretrial brief filed by the prosecutor, it stated that "the People welcome a stipulation to the defendant's prior convictions."

Finally, Castellanos also argues that unlike counsel in *Stewart, supra,* 33 Cal.4th 425, his trial counsel "did not *ask* the court to allow the prosecutor to use all of the priors." (Italics added.) But this raises a distinction without a difference. Counsel in *Stewart* did not want to leave the jury with the impression that the defendant may have been convicted of an "'[e]gregious felony or an unspecified felony "'without explanation.'"' (*Id.* at p. 477.) In this case, none of Castellanos's prior felony convictions involved any crimes of violence. Thus, it is reasonably likely that Castellanos's trial counsel did not object to the admission of his prior felony convictions for the same general reasons that were stated by trial counsel in *Stewart.*

To reiterate and conclude as to Castellanos's first claim of evidentiary error, we hold that the trial court properly admitted Castellanos's prior felony convictions for the purpose of proving his status as a felon. (See *Stewart, supra,* 33 Cal.4th at pp. 477–478.)

## B. *Alleged Improper Admission of Opinion Testimony*

Castellanos claims: "The trial court prejudicially abused its discretion in permitting [a police officer] to express his opinion on appellant's credibility." (Capitalization & boldface omitted.) We disagree.

A challenge to the admission of evidence is reviewed for an abuse of discretion. An appellate court will ordinarily "not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner." (*People v. Jones, supra,* 57 Cal.4th at p. 947.)

14

In this part of the discussion, we shall: 1) state the relevant principles of law regarding opinion testimony; 2) summarize the trial court proceedings; and 3) analyze the law as applied to the facts.

### 1. *Principles of Law*

"Except as otherwise provided by statute, all relevant evidence is admissible." (§ 351.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)

Lay opinion testimony is admissible if it is "[r]ationally based on the perception of the witness," and is "[h]elpful to a clear understanding of his testimony." (§ 800 (a)-(b).) Generally, a witness's opinion about the veracity of another person's statement is inadmissible. (*People v. Montes* (2014) 58 Cal.4th 809, 865.) However, an officer's testimony with respect to whether he believed a witness may be admitted to "assist[] the jury in understanding the actions of the police." (*People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 33.)

### 2. *Trial Court Proceedings*

During the trial, the jury listened to, and was given transcripts of Castellanos's postarrest (Miranda) interview, which lasted about three-and-a-half hours. One of the officers who participated in the interview testified:

"[PROSECUTOR:] Detective, when you were in the – doing the Miranda interview, approximately how many stories did you calculate the defendant told you during that interview?

"[DEFENSE:] Objection. Speculation and vague.

15

"[COURT:] Overruled.

"[WITNESS:] I would say that there were four distinct stories.

"[PROSECUTOR:] And you say distinct. What do you mean by that?

"[WITNESS:] That they didn't match up to the other four stories. So there were inconsistencies.

"[PROSECUTOR:] And what kind of inconsistencies did you catch onto?

"[WITNESS:] So there were several inconsistencies. For example, there were certain people, and one person that was in one story that [was]n't in the other version of the story. The location of the starting point of the story was different. Whether or not somebody had a cell phone was different. The timeframes of the stories were different.

"[PROSECUTOR:] Now, what was the first story that you heard?

"[DEFENSE:] Your Honor, I'm going to object to the statements on the record. The recording is on the record. I think that this is an undue consumption of time.

"[COURT:] Overruled. I think at this point it sounds like to me we're just summarizing what each of them are. [¶] And I will remind the jury that the actual evidence is the recording that we already listened to. I believe that the detective is just going to summarize what he believes are the different stories.

"[DEFENSE:] And I would object to speculation as to what he believes those stories are.

"[COURT:] Overruled.

"[PROSECUTOR:] So what was the first story that you heard?

"[WITNESS:] For clarity I'll refer to it as the fussy baby story."

16

The "fussy baby story" began with Castellanos and Torres in Apple Valley. It was daytime, and Castellanos went inside his house to check on his daughter; when he came back outside, he noticed that Torres was gone. He drove his daughter around for about 30 minutes to calm her down, and then he went back inside his house for the rest of the day.

The prosecutor asked, "And what was the next story that you heard?" The officer described it as the "Roland Heights story" because that is where it originated.

The "Roland Heights story" began with Castellanos at an acquaintance's house in Roland Heights. Torres had contacted him and asked for a ride home. Castellanos wanted to check on his daughter in Apple Valley, so they went there. Torres stayed in the car while Castellanos went inside the house; he "came outside a period of time later and [Torres] was not there."

After a break in the interview, the officer said Castellanos related a third story, which the office referred to "the Jacob story."

Castellanos said he was "at somebody's house named Sharks or Shark down in the Roland Heights area." Castellanos called his brother, Jacob, to pick him up. The prosecutor asked, "was there anything that caught your attention about the Jacob story as opposed to fussy baby or Roland Heights?" The officer testified that "we have two new names introduced with Shark or Sharks and Jacob."

As to the fourth story, the officer testified Castellanos made statements that matched the evidence. The officer testified that "after several minutes of going back and forth," Castellanos admitted he "actually did go across the street to the neighbor's house." Castellanos said a "big [B]lack dude" opened the door, and both Leora and her babysitter had described Dog as a muscular, mixed race Black male.

17

### 3. Application and Analysis

An officer's testimony summarizing a defendant's interview does not constitute inadmissible opinion evidence. (*People v. Stitely* (2005) 35 Cal.4th 514, 546–547 (*Stitely*).) In *Stitely*, a detective interviewed defendant about a murder. (*Id.* at pp. 545–546.) At trial, the detective said part of his technique was "disclosing incriminating evidence whenever it seemed defendant was 'not being truthful.'" (*Id.* at p. 546.) The detective "said that this process exposed apparent 'lies' on defendant's part." (*Ibid.*) The defendant objected to the testimony on the grounds that the prosecutor asked the detective "leading and argumentative questions, and assumed facts not in evidence." (*Ibid.*) The trial court overruled the objections. On appeal, defendant argued the detective's testimony was "in violation of state law rules restricting both expert and lay opinion testimony." (*Ibid.*)

The Supreme Court disagreed: "First, . . . defendant did not seek to exclude the evidence below on any theory raised here. As in prior cases involving a failure to object on similar grounds, the claims have been forfeited on appeal. [Citation.] [¶] Second, defendant misreads the record. [The detective] highlighted the twists and turns in a long interrogation. Nothing in this testimony or the trial court's rulings indicated that [the detective] was offering an opinion for direct jury consideration on the issue of defendant's credibility. No reasonable juror would have viewed the evidence this way. Moreover, [the detective's] testimony mirrored the interview heard by the jury . . . ." (*Stitely, supra,* 35 Cal.4th at pp. 546–547.)

Here, just as in *Stitely*, the arguments being raised on appeal were not raised at trial, so they have been forfeited. In any event, the officer did not offer his opinions regarding Castellanos's credibility, the officer merely "highlighted the twists and turns in a long interrogation." (See *Stitely*,

18

*supra*, 35 Cal.4th at p. 546.) Further, the jury was free to compare the officer's testimony with the recorded interview. Thus, we find the trial court committed no evidentiary error in this regard.

Castellanos argues "there was no relevant purpose for admitting . . . 'different stories' appellant gave concerning his whereabouts and actions." We disagree. Castellanos's answers during the interview were lengthy and meandering, so the officer's summary was relevant and helpful to the jury's understanding of the evidence. (*People v. Singleton* (2010) 182 Cal.App.4th 1, 20 ["'testimony may be admitted in circumstances where it will assist the jury to understand the evidence'"].)

## C. *Prejudicial Instructional Error Claim*

Castellanos claims: "Prejudicial instructional error permitted jurors to convict . . . by improperly using the remote gun possession priors to prove identity." (Capitalization & boldface omitted.) We agree.

We review instructional error claims de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) In this part of the discussion, we shall: 1) state the general principles of law concerning jury instructions; 2) summarize the trial court proceedings; and 3) analyze the law as applied to the facts.

### 1. *Principles of Law*

The trial court has a sua sponte duty to give *correct* instructions on the basic principles of the law applicable to the case . . . ." (*People v. Williams* (2009) 170 Cal.App.4th 587, 638, italics added.) "The general principles of law governing the case are those principles closely and openly connected with the evidence which are necessary for the jury's proper consideration of the case." (*People v. Owen* (1991) 226 Cal.App.3d 996, 1004.)

19

Generally, a prosecutor is prohibited from introducing evidence concerning a defendant's uncharged conduct. (*People v. Cottone* (2013) 57 Cal.4th 269, 285.) "Except as provided . . . , evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) The purpose of this basic evidentiary rule "is to assure that a defendant is tried upon the crime charged and is not tried upon an antisocial history." (*People v. Aeschlimann* (1972) 28 Cal.App.3d 460, 473.)

However, an exception to the general rule is that a defendant's uncharged conduct may be admitted "'not to prove a person's predisposition to commit such an act, but rather to prove some other material fact, such as that person's intent or identity.'" (*People v. Rocha* (2013) 221 Cal.App.4th 1385, 1393.) "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act." (§ 1101 (b).)

Section 1109 is another exception allowing for the admission of evidence of uncharged conduct. Section 1109 evidence is admitted for the purpose of showing a defendant's "propensity" to commit a crime when that defendant is charged with a domestic violence offense. "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 *if* the evidence is not inadmissible pursuant to Section 352." (§ 1109 (a), italics added.)

A jury is instructed that it may consider evidence of a defendant's

20

uncharged conduct if the jury "finds 'by a preponderance of the evidence' that the defendant committed" the uncharged acts. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1224, fn. 14.) A "preponderance of the evidence" for an uncharged offense is a considerably lower burden of proof than the due process requirement of proof beyond a reasonable doubt for a charged offense. (See *People v. Johnson* (2004) 119 Cal.App.4th 976, 985.)

Upon request, the trial court has an obligation to instruct the jury concerning the "limited purpose" of evidence admitted under section 1101 (b). (*People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1177.) Further, the court must analyze and appropriately instruct the jury on precisely what issue or issues that evidence has been admitted to prove under section 1101 (b), such as the defendant's identity, intent, knowledge, lack of mistake or accident, plan, etc. (*People v. Swearington* (1977) 71 Cal.App.3d 935, 949.)

Under section 1101 (b), the least degree of similarity between the uncharged act and the charged offense is required in order to prove intent, a greater degree of similarity is required in order to prove the existence of a common design or plan, and the *greatest degree of similarity* is required to prove a defendant's identity. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328; *People v. Scott* (2011) 52 Cal.4th 452, 472 ["For identity to be established, the offenses must share common features that are so distinctive as to support an inference that the same person committed them"].)

A defendant's uncharged conduct may constitute "highly inflammatory" evidence. (*People v. Davis* (2009) 46 Cal.4th 539, 602.) As such, if a trial court finds the proffered evidence relevant under section 1109 or section 1101 (b), it must then also determine whether the potential for prejudice outweighs the probative value. (§ 352.)

21

## 2. Trial Court Proceedings

In its pretrial brief, the People sought to admit evidence of Castellanos's prior criminal convictions for two purposes: (1) to establish his status as a convicted felon, and (2) for impeachment purposes should he choose to testify. The People further sought to introduce evidence of Castellanos's prior acts of domestic violence "to prove defendant's disposition to commit the charged incident of domestic violence." (§ 1109.) The People initially sought to admit two alleged prior incidents through the testimony of Leora under section 1109. The People did not make any mention of section 1101 (b) within the pretrial brief.

In a pretrial hearing, Leora testified that she witnessed four prior incidents of domestic violence committed by Castellanos against Torres. As to each incident, the trial court found it fell under the definition of domestic violence and found the testimony admissible under section 1109.[4] The court did not find any evidence whatsoever admissible for any purpose under section 1101 (b).

At the conclusion of the trial evidence, there was a hearing out of the presence of the jury regarding "lesser included offenses to murder." After a discussion as to the lesser included offenses, the court asked the prosecutor, "[W]hat theories do you intend to use to establish first-degree murder?" The prosecutor responded, "Willful, premeditated, and deliberate, as well as lying in wait." After some discussion, the court told the parties that it "will add those instructions." The court said: "Let's plan on meeting tomorrow at 8:30 to do a final run through of these."

---

[4] While not raised in the briefs, we note that the trial court did not analyze the proffered domestic violence evidence under section 352 as it was required to do. (See *People v. Brown* (2011) 192 Cal.App.4th 1222, 1233.)

22

The court further told the parties, "Also, when you look at them tonight, I'm always available by email. If we want to start shooting things around, things you'd like added, removed. Anything everyone agrees to is easy. We can also take arguments in the morning. I'm all digital. So it's really easy for me to copy and paste anything quickly."

The following morning, the court said, "Let's go on the record in the Castellanos matter. Both counsel are present. The defendant is not present but has waived his presence just for the discussion of jury instructions." The court said, "So version 3 is our controlling version right now. Are there any instructions currently in Version 3 that either party would like removed or at least to discuss removal?"

After a brief pause, Castellanos's counsel said, "I agree with the instructions given."[5]

The court instructed the jury using CALCRIM No. 2510 (Possession of a Firearm by Person Prohibited Due to Conviction), which provided in relevant part:

"To prove that the defendant is guilty of [unlawfully possessing a firearm], the People must prove that: [¶] 1. The defendant possessed a firearm; [¶] 2. The defendant knew that he possessed the firearm; [¶] AND

---

[5] A copy of the instructions given to the jury was included in the clerk's transcript on appeal (the table of contents for the instructions was marked as version one; the posttrial instructions were marked as version four). The prior version referenced by the court in the transcript (version three) was not included in the record on appeal. Further, the record does not appear to indicate whether the parties may have requested or objected to particular instructions (through email or otherwise). Should there be a retrial, we strongly encourage the trial court and the parties to be mindful of creating a complete and accurate record of any substantive discussions (or any rulings) regarding jury instructions.

[¶] 3. The defendant had previously been convicted of a felony." The court did not instruct on the following optional bracketed language in CALCRIM No. 2510: "You may consider evidence, if any, that the defendant was previously convicted of a crime only in deciding whether the People have proved this element of the crime [or for another limited purpose]. Do not consider such evidence for any other purpose."[6]

The court instructed the jury using CALCRIM No. 852A (Evidence of Uncharged Domestic Violence), which provided, in part:

"The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] *Domestic violence* means abuse committed against an adult who is a person who dated or is dating the defendant. [¶] *Abuse* means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. . . . [¶] If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit domestic violence, as charged here."

The court instructed the jury using CALCRIM No. 375 (Evidence

---

[6] We find the trial court did not have a *sua sponte* obligation to give this bracketed language, which is included as an optional portion of CALCRIM No. 2510. (See *People v. Hinton* (2006) 37 Cal.4th 839, 875–876.)

of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.), which provided:

"The People presented evidence that the defendant committed other offenses that were not charged in this case.

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:

"The defendant was the person who committed the offenses alleged in this case; or [¶] The defendant acted with the intent to commit domestic violence in this case; or [¶] The defendant had a motive to commit the offenses alleged in this case; or [¶] The defendant's alleged actions were not the result of mistake or accident; or [¶] The defendant had a plan to commit the offenses alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. [¶] Do not consider this evidence for any other purpose. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of

25

Murder or Possession of a Firearm by a Felon or that the Personal and Intentional Discharge of a Firearm Causing Great Bodily Injury or Death has been proved. The People must still prove the charges and the allegations beyond a reasonable doubt."

### 3. Application and Analysis

At no point did the People seek to introduce Castellanos's prior uncharged offenses under section 1101 (b). That is, the People introduced no uncharged offenses for the purpose of proving Castellanos's identity as the shooter, or his intent, or his motive, or his lack of mistake or accident, or his plan to commit the crimes. Further, at no point did the trial court compare and analyze the similarity of Castellanos's uncharged offenses to the charged crimes, as required under the various provisions of section 1101 (b) (intent, motive, plan, etc.). (See *People v. Foster*, *supra*, 50 Cal.4th at p. 1328.) Moreover, at no point did the court analyze the probative value of the uncharged offenses against their prejudicial effect, as required under sections 352 and 1101 (b). (See *People v. Lewis* (2001) 25 Cal.4th 610, 637.)

Nonetheless, the trial court inexplicably instructed the jury, in relevant part: "If you decide that the defendant committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether: [¶] The defendant was the person who committed the offenses alleged in this case." (CALCRIM No. 375.)

It is well established that "the "Bench Notes and the CALCRIM jury instructions are not themselves legal authority." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1269; see also *People v. Mojica* (2006) 139 Cal.App.4th 1197, 1204, fn. 4 ["Although pattern jury instructions are prepared by distinguished legal scholars and provide a valuable service to the

courts, they are not the law and are not binding"].) However, the "jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).)

The Bench Notes to CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.), advise a trial court that: "If evidence of uncharged conduct is admitted *only* under Evidence Code section 1108 or 1109, **do not** give this instruction." (Bench Notes to CALCRIM No. 375 (2024) p. 150, emphasis in original.)

Here, the trial court admitted domestic violence evidence only under section 1109. But the court instructed the jury using CALCRIM No. 375, the instruction regarding evidence under section 1101 (b), even though no evidence was admitted under section 1101 (b), and the giving of the CALCRIM No. 375 jury instruction was contrary to the Bench Notes.

In short, we hold that the trial court plainly committed instructional error by erroneously instructing the jurors using CALCRIM No. 375, and we further find that as a result of this error one or more of the jurors may have concluded that they could consider Castellanos's prior uncharged offenses for the purposes of proving his identity as the shooter, which was essentially the only disputed issue at trial.

The Attorney General argues Castellanos has forfeited his instruction error claim on appeal. We disagree.

The rule of forfeiture on appeal does not apply if a court's jury instruction was an incorrect statement of the law. (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) The Attorney General agrees that the trial court admitted no evidence under section 1101 (b). Under these circumstances, the erroneous section 1101 (b) instruction (CALCRIM No. 375) was an incorrect statement of the law and Castellano has not forfeited his instructional error

27

claim on appeal.

The Attorney General also argues, "CALCRIM No. 375 was expressly applicable only to 'uncharged offenses,' which plainly excludes the evidence of his prior convictions and could only apply to evidence of [Castellanos's] uncharged domestic violence conduct." We disagree.

Evidence of uncharged offenses under section 1101 (b) can include evidence of a defendant's prior convictions. (See *People v. Perkins* (1984) 159 Cal.App.3d 646, 651 ["The question of whether to admit evidence of the *prior conviction* was properly focused on Evidence Code section 1101(b)"], italics added.) Therefore, contrary to the Attorney General's assertion, the erroneous CALCRIM No. 375 jury instruction did not necessarily exclude the evidence of Castellanos's prior felony convictions.

Further, given that the court gave an accurate instruction that directly related only to the section 1109 evidence (CALCRIM No. 852A), we find one or more jurors could have reasonably interpreted the erroneous instruction (CALCRIM No. 375) to apply to Castellanos's prior convictions. That is, one or more jurors may have improperly considered Castellanos's other uncharged offenses—specifically, the two prior felony convictions for unlawful firearm possession not charged in this case—to prove his identity as the shooter, as well as his motive, plan, lack of mistake or accident, etc.

The Attorney General did not concede the instructional error in his brief, but argues "even if it was error for the court to instruct the jury with CALCRIM No. 375, any error was harmless." We disagree.

Claims of instructional error are examined for prejudice "based on a review of the instructions as a whole in light of the entire record." (*People v. Lucas* (2014) 60 Cal.4th 153, 282, overruled on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53–54, fn. 19.) The test for

28

harmless error is set out in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which generally applies to ""'incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error.'"" (*People v. Beltran* (2013) 56 Cal.4th 935, 955.)

Under *Watson*, a reviewing court *must* reverse if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra*, 46 Cal.2d at p. 836.) The Supreme Court has ""'made clear that a 'probability' in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.'"" (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050, italics omitted; see also *People v. Soojian* (2010) 190 Cal.App.4th 491, 519 [a more favorable result includes a mistrial due to a hung jury].)

Castellanos argues: "Collectively, the instructions did not limit use of the gun possession priors for the ex-felon element, while at the same time, the instructions impermissibly allowed jurors to use that same evidence to prove identity, which was the central disputed issue in the case." He further argues: "Given the closeness of the case on the issue of identity, there is a reasonable chance, more than an abstract possibility, that a single juror voted to convict by using the evidence appellant had previously been convicted of gun possession crimes, to infer identity—that he had a gun that day and used it to shoot Torres—when the instructions specifically allowed jurors to do so." We agree.

In this case, there was compelling circumstantial evidence that tended to prove Castellanos was the shooter (e.g., the section 1109 evidence, the evidence of Torres seeking shelter from Castellanos just before the shooting, Castellanos's incriminating statements, etc.). However, there was no eyewitness testimony, or any forensic evidence offered to prove that

Castellano was, in fact, the shooter (e.g., DNA evidence, fingerprint evidence, ballistics evidence, etc.). There were some spent cartridges that were found near the crime scene, but they were not directly linked to the shooting, nor were they linked to Castellanos.

Leora testified Castellanos regularly carried a gun, but she was the only witness who testified to this fact at trial. While there was other circumstantial evidence tending to support her testimony, we find there is a *reasonable chance* that one or more jurors may have improperly considered the evidence of Castellanos's prior convictions (e.g., possession of a weapon by a felon), to bolster Leora's credibility given the erroneous CALCRIM No. 375 instruction concerning section 1101 (b).[7] (See *People v. Horton* (1995) 11 Cal.4th 1068, 1121 [jurors are presumed to follow the court's instructions].)

"Juror questions and requests to have testimony reread are indications the deliberations were close." (*People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295; *People v. Fuentes* (1986) 183 Cal.App.3d 444, 456 ["we are influenced by the fact that the jury did not find this to be an easy case"]; *People v. Cardenas* (1982) 31 Cal.3d 897, 907 ["The jury deliberated for 12 hours before returning its guilty verdicts. This court has held that jury deliberations of almost six hours are an indication that the issue of guilt is not 'open and shut' and strongly suggest that errors . . . are prejudicial"].)

---

[7] Again, the trial court did <u>not</u> instruct the jury as to count two (Pen. Code, § 29800, subd. (a)(1)), with the following bracketed language: "You may consider evidence, if any, that the defendant was previously convicted of a crime only in deciding whether the People have proved this element of the crime . . . . Do not consider such evidence for any other purpose." (CALCRIM No. 2510.) Although the court had no *sua sponte* obligation to use this optional bracketed language within the instruction, we find this omission contributed to the prejudicial effect of the court's instructional error. (See *People v. Lucas*, *supra*, 60 Cal.4th at p. 282.)

Here, the jury deliberated for a longer period of time (about three days) than the prosecution took to put on its case (about two days). On the second full day of deliberations, the jurors asked for a readback of Leora's testimony. And on the third full day of deliberations, the jurors asked for a readback of the babysitter's testimony. These were the only two percipient witnesses that testified during the trial. The second jury request form stated that the jury wanted to clarify the testimony about a phone call between the babysitter and Leora right after the shooting. The jury said it wanted "to clarify between 'Greeneyes shot her' vs. 'He shot her.'" That is, the jury's written request appeared to go directly to the issue of the witnesses' credibility, as well as the identity of the shooter.

In sum, we conclude there is a reasonable chance (more than an abstract possibility) that the jury would have reached a result more favorable to Castellano (either a hung jury or an acquittal) in the absence of the trial court's instructional error; therefore, we are obligated to reverse Castellanos's convictions.[8] (See *Watson, supra*, 46 Cal.2d at p. 836.)

---

[8] We note that we are definitely <u>not</u> making a finding that the verdicts are not supported by substantial evidence. (See *People v. Hallock* (1989) 208 Cal.App.3d 595, 607 [if reversal is required for instructional error, but substantial evidence supports the verdicts, double jeopardy principles do not prevent a retrial].)

## III.

## DISPOSITION

The judgment is reversed.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


DELANEY, J.